Hosteen SAKEZZIE and Thomas Billy, in their own behalf and as members of the class of persons who are Navajo Indians residing within the Aneth Extension of the Navajo Indian Reservation in San Juan County, Utah, Plaintiffs,

v.

The UTAH STATE INDIAN AFFAIRS COMMISSION and Its Members, Beverly S. Clendenin, Chairman, Harold Drake and Don Smith, Defendants.

No. C 55–61.

United States District Court
D. Utah,
Central Division.
Feb. 7, 1963.

Milton A. Oman, Salt Lake City, Utah, for plaintiffs.

Ronald N. Boyce, Asst. Atty. Gen., of Utah, Salt Lake City, Utah, for defendants.

CHRISTENSEN, District Judge.

### MEMORANDUM DECISION

This case in its present post-judgment phase presents further problems in relation to the defendant Commission's statutory duty with reference to a fund entrusted to the State of Utah by Congress from oil royalties from leased land in the so-called Aneth Extension of the Navajo Indian Reservation on condition that it be expended for designated purposes "or for the benefit of the Indians residing therein". Public Law No. 403, 47 Stat. 1418; Chapter 22, Title 63, Utah Code Annotated, 1953.[1]

The plaintiffs, pursuant to 28 U.S.C.A. § 2202,[2] have petitioned for supplemental relief based upon the declaratory judgment entered by this court on August 25, 1961.[3] No appeal was taken by either party from this judgment.

[1]. The significant provision of both enactments is that 37½% of the net royalties accruing from the lands added to the Navajo Reservation by the Federal Act, which land we shall hereafter refer to as the "Aneth Extension" or the "Extension" shall be expended by the State of Utah "in the tuition of Indian children in white schools and/or in the building or maintenance of roads across the lands described in Section 1 hereof [Aneth Extension], or for the benefit of the Indians residing therein. * * *"

[2]. "2202. *Further Relief.* Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party where rights have been determined by such judgment."

[3]. The findings of fact and the conclusions of law in conformity with which judgment was entered are reported in Sakezzie v. Utah Indian Affairs Commission, D.C. Utah, 198 F.Supp. 218 (1961).

It is alleged in the petition that defendants have violated the provisions and declarations of the judgment by:

(a) Failing to use the fund for the direct benefit of the Indian beneficiaries and by threatening to utilize the fund to discharge general governmental or tribal duties.

(b) Being about to expend approximately $300,000 for the construction of a segment of public road extending between Ship Rock, New Mexico and Blanding, Utah, which could be of only remote, if any, benefit to the Indian beneficiaries.

(c) Refusing to invest a portion of such fund in range lands and ranches to make possible year-round livestock operations of the Indian beneficiaries.

(d) Failing to ascertain and give consideration to the views of the beneficiaries in determining the use of the fund.

(e) Refusing to furnish to plaintiffs and their counsel information concerning the receipt and disbursement of the fund.

(f) Refusing to initiate an affirmative program for the benefit of plaintiffs in harmony with the judgment.

The petition asserts that injunctive relief reasonably is necessary to secure compliance by the defendants and that a bond should be required to indemnify the plaintiffs from further losses. Costs, expenses and attorneys' fees from the fund also are sought. In addition to these specific remedies, plaintiffs pray for general relief, and in their brief have added the demand that the individual defendants be required to reimburse the fund for all disbursements since the entry of the judgment.

The defendants' answer puts in issue these allegations and demands, although not questioning the binding effect of the judgment and the findings of fact upon which it was based.

Conclusions of law in conformity with which the judgment entered are reported in 198 F.Supp., beginning at 224. Since the judgment itself has not been reported, some of its main provisions are summarized:

The judgment determined that it is the duty of the defendant Commission to expend the Aneth Extension fund for the benefit of the Indians residing upon the Extension; that as to them the Commission and its members occupy the position of a trustee, and that they owe to the plaintiffs and those they represent, as distinguished from the Navajo officers or tribe in general, the duty to exercise reasonable care, good faith and loyalty, in accordance with exacting fiduciary standards, within the trust and discretion Congress saw fit to repose in the agencies of the State in carrying out the purposes of the Federal Act; that payment of tuition and the construction and maintenance of roads across Extension lands are not the only authorized expenditure of funds for the benefit of the Indians residing in the Extension lands and that the defendants have a wide discretion to provide other benefits; that there is no authority to expend funds for roads outside of the Aneth Extension; that in the management and disbursement of said fund the defendants not only have the duty to refrain from utilizing it for unauthorized purposes but to reasonably expend it for authorized purposes, they being not merely conservators charged with its profitable investment and safeguarding but rather administrators charged with the making of beneficial expenditures from the fund to assist the beneficiaries referred to in the Federal statute, and that the defendants had the duty to ascertain, and at least to consider the views of the beneficiaries concerning expenditures from the fund and to make reasonably accurate, complete and current information available to them.

I deemed some of the expenditures theretofore made, and the refusal to consider other expenditures, on the part of the Commission, somewhat questionable. But holding plaintiffs strictly to their burden of proof, and in deference to the Commission's wide discretion, all

but the most substantial of the expenditures were approved. This was done with confidence that clarification by declaratory judgment of the Commission's duties, some of which obviously it had misapprehended, would obviate further difficulty.

It was determined, however, that a proposed expenditure of $500,000 for a hard surface road from the vicinity of Montezuma Creek in the Extension, through Aneth and thence to the Colorado line, was not authorized. The defendants' tentative commitment for financing such a project thereupon was abandoned.

Since the judgment, however, the defendants have committed, but have not yet disbursed, the sum of $175,000 for the construction of a segment of paved road (now complete) traversing a portion of the Extension in the vicinity of Montezuma Creek. The cost for this segment has been computed reasonably with relation to only the portion of the road which traverses the Aneth Extension. But the new road comprises a part of the larger system contemplated by the prior project. Contrary to the present contention of plaintiffs, it was not determined in the main case that such segment, as distinguished from the larger project initially proposed, would not be properly for the benefit of the Indians,[4] and that question is still open.

The defendants say that the construction of the segment of the road in question will be of some benefit to the Indians residing within the Aneth Extension by providing a part of the only properly engineered road south through the Aneth extension to the Navajo Tribal Subagency at Ship Rock, New Mexico, and the Navajo Chapterhouse used by the plaintiffs in common with other Navajos at Aneth, Utah. This is largely true. And the road moreover generally will facilitate travel and promote tourism in the Extension. The latter considerations will be of only remote benefit to the Indians residing in the Extension. Under the arrangements made by the defendants with the State Highway Department the maintenance of the road will be assumed by the State of Utah, thus relieving the defendant Commission from maintenance charges which they can incur under the statute in proper cases.

It thus must be concluded on the basis of the facts heretofore found and the evidence introduced in the supplemental proceedings that the segment of road in question would benefit the plaintiffs and those whom they represent substantially, but not exclusively or even primarily. It is also plain from the evidence that the motivating purpose of the Commission in constructing this road was not solely to benefit the Indians.

---

4. The court found among other things that "The resident Indians travel on foot, by horseback or by pickup truck over existing roads which except for flash floods or unusual emergencies are generally adequate for their purposes, and which could be suitably improved for their purposes by a relatively small portion of the proposed expenditure for roads. A hard surface road as proposed from the vicinity of Montezuma Creek through Aneth to the Colorado line would be of some benefit to the Indians resident on the Extension but not in proportion to the proposed expenditure [$500,000] and would be of primary benefit to tourists, white persons within and without the area, business interests and the public in general. Moreover, the present proposal of the defendants calls for substantial expenditures for connecting road purposes outside of the Extension." It was concluded that " * * * the State has general public duties with respect to the construction and maintenance of highway and road systems throughout the State of Utah and that while Congress was willing to assume that the expenditures from the fund for roads within the Extension would not unduly involve a conflict of interest that could not properly be resolved in the administration of the fund, this authority and the possible conflicts that would be involved otherwise were not intended to extend beyond the boundaries of the Extension in respect to roads. In any event, in view of the evidence, it is concluded that expenditures for the proposed road would not be such as to be for the benefit of those specified in the Federal statute and within its contemplation."

The plaintiffs argue that the prior determination with reference to roads established as the law of the case that roads within the Aneth Extension had to be for the exclusive benefit of the Indians residing there. It is true that the court indicated generally with reference to expenditures by the Commission that the motivating intention in order to justify the expenditure had to be to benefit the Indians, but the specific holding with regard to the proposed expenditure for the Montezuma Road was that a road lying both within and outside the Extension was not shown to be sufficiently for the benefit of the Indians as to be justified. The court's oral pronouncement consistent with the more general written conclusion on the point (TR. Jan. 12, 1961 hearing, pp. 16–17) indicated that effect must be accorded the statutory authorization for the construction of roads within the Extension.[5]

I conclude that expenditures for roads are in a category different under the statute from that of other expenditures which expressly must be for the benefit of the Indians. Congress has indicated that the construction of roads on the Aneth Extension is at least generally speaking a legitimate purpose of expenditures from the fund. And the burden thus is considerably heavier upon the plaintiffs with reference to such an expenditure to show that the Commission abused its discretion.

The defendants on the other hand, would have it determined that the last clause of the authorization does not operate to limit at all the expenditure for roads to projects of benefit to the Indians. I consider this conclusion too broad. I cannot believe that Congress, in view of conflicts of interest, intended with respect to roads to give unlimited power to the State to spend money for roads in the Extension having no relationship to the welfare of the Indians. The three types of expenditures must be considered homogeneous despite their disjunctive form in view of the limitations of the last clause, and the policy and objectives of the legislation.[6] Any reasonable doubts should be resolved in favor of pro-

5. At that time I said: "We come finally to the tentatively committed funds for the construction of a road off the Aneth Extension. A further reference to the statute shows that * * * the expenditure of these funds is expressly authorized * * * in the building or maintenance of roads across the land 'described in Section 1 hereof'. Ordinarily it might well be concluded that the limitation of the power to spend for road purposes for roads across lands described in Section 1 * * * would simply be to relieve the State of any concern that they couldn't spend for roads across the Indian land. That would be taken for granted, and they wouldn't even have to have the determined benefits. Congress has established by law that that would be for the benefit of the Indians. And that would seem in a way a fair interpretation, leaving for determination of the Commission whether roads across other areas would be * * * But considering that these funds are in the nature of trust funds, that the State has the primary obligation on the part of all citizens of providing a system of public roads in connection with the Federal government, it well could have been the intent

of Congress to limit the expenditure of funds for road purposes to these particular lands * * * If you get beyond these particular lands, then the duty of the State and the allocation and balance of that duty would lead to a morass of difficulty and would involve a real conflict of interest which would be avoided should the language of the Federal statute be given force, that is, that expenditures for road purposes are to be limited to the development of roads on the Aneth Extension * * * The problem is not free from doubt. But even though I should be in error with regard to this, I do not think that the evidence justifies a finding that connecting roads would be so for the benefit of the Indians involved here, as far as they are constructed off the Aneth Extension, as to be within the contemplation of the Federal Act."

6. Sutherland Statutory Construction, 3rd Ed. § 4923, note 3; Union Ins. Co. v. United States, 6 Wall (73 U.S.) 759, 18 L.Ed. 879 (1867); State ex rel. v. Hooker, 22 Okl. 712, 98 P. 964 (1908); Marteney v. United States, 216 F.2d 760 (10 Cir., 1954).

tection for the Indians.[7] Were it not for this latter principle peculiarly applicable here, the ordinary rules would support the position of the defendants.[8]

■ I conclude that the commitment for the road in the vicinity of Montezuma Creek on the Aneth Extension is highly questionable but in the amount and under the circumstances involved here must be deemed within the broad powers of the Commission in reference to roads on the Extension.

■ In addition to the last mentioned segment of road the defendants have contributed from the fund for the construction of another road on Extension lands in the Navajo Mountain area the sum of $44,000. The construction of this road is established by the evidence to have been intended, and to be, primarily for the benefit of the Indians resident upon the Extension, and thus authorized.

The defendants have expended inconsequential sums to send Indian children residing on the Aneth Extension to white schools. While the propriety of these expenditures is not sharply at issue both sides have raised questions concerning the meaning of the term "tuition" as used in the statute.

■ The expenditures made in connection with school costs to date have been justified. But the defendants have suggested that the power to expend money for "tuition" of Indians in white schools may be restricted to the payment of enrollment charges assessed by the schools. I am of the opinion that the meaning of the term in context is also broad enough to encompass charges necessary or incidental to attendance, such as for books, board and room and traveling expense,[9] within the reasonable discretion of the Commission.

It is to be noted that the statute does not say such funds may be expended only "for tuition" but that they shall be expended "in the tuition" of Indian children in white schools; or, paraphrasing one dictionary meaning of the term, "in the care, and instruction of Indian children in white schools".

■ In interpreting ambiguous statutes with reference to Indians, a liberal interpretation in favor of the Indians should be indulged, even though a meaning not currently common must be applied to harmonize the context or to more fully advance the policy and objectives of the legislation. Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507.

■ The Commission has committed approximately $70,000 toward the construction by the Seventh Day Adventists of a medical clinic in the vicinity of Navajo Mountain, in order to provide minor medical treatment and facilities for the Indians residing in the Aneth Extension and other Indians and persons in the vicinity. While such medical facility is not exclusively, or even primarily, intended for the benefit of the Indians residing upon the Aneth Extension, it is a highly desirable and necessary one for such Indians, as demonstrated by the evidence in the case. The total cost of the construction and maintenance of this facility and the furnishing, installation and maintenance of the

7. Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507; United States v. Hallam, 304 F.2d 620 (10 Cir., 1962), citing Squire v. Copoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883.

8. Sutherland Statutory Construction, 3rd Ed. § 4923. supra. Thus, in the construction of the Pennsylvania Clear Streams Act the court held that the use of "or" between clauses prevented the second clause from acting as a limitation upon the first.

9. Webster's New International Dictionary, Second Edition, Unabridged defines tuition as "(1) protection; care, custody; esp., the care of a tutor or guardian over a pupil or ward; guardianship, now rare (2) the act or profession of teaching; the services of a teacher or teachers; instruction, as to give or seek tuition in latin; the fees for tuition; * * * (3) the price or payment for instruction * * *"

equipment essential for its operation far exceeds the commitment of funds by the Commission. It fairly may be said that the purpose of the Commission's contribution was to benefit the plaintiffs and those they represent, who separately could not be furnished by such a limited expenditure the facilities that are now available to them in connection with other persons. This expenditure properly may be considered for the primary benefit of the Indians residing on the Extension to the extent of the Commission's contribution. American Nat. Bank, etc., v. American Baptist Home M. Soc., 106 F.2d 192 (2 Cir., 1939).

■ The defendants have kept full and proper accounts of the funds received by them which are computed and transmitted by Federal authority. They, however, have demonstrated remarkable unconcern about keeping the beneficiaries of the fund informed of accretions to said fund, about disbursements and commitments therefrom and about plans with respect to future expenditures, have failed to do what was convenient and reasonably within their power to advise the beneficiaries concerning these and other matters and have often ignored without justification or excuse requests and inquiries by the Indians or their representatives.

No effective canvass of sentiment among the Indians directly interested in the fund has been made with regard to future commitments or projects. The defendants have relied principally upon the views of their field representative, a white business man and property owner from Blanding, which is a community having direct interest in road work within the reservation, and upon one of the defendants herein who is a member of the Navajo Tribal Council.[10]

While in the conclusions and judgment heretofore entered the court perhaps with excessive circumspection endeavored only gently to indicate the duty of the defendant State officials with regard to the furnishing of information to the plaintiffs, nonetheless it was made clear that they have an affirmative duty not only to make reasonably available to the plaintiffs adequate information concerning the administration of the trust, but to seek out their advice and consultation before coming to determinations as to expenditures of trust funds.[11] It is clear to the court that the defendants

10. The declaratory judgment provided among other things that in the administering of the fund defendants occupy a position of trust and confidence toward the Indian beneficiaries and their conduct should be determined and judged by exacting fiduciary standards within the trust and discretion which Congress saw fit to repose in the agencies of the State in carrying out the purposes of Federal Acts; that in addition to general principles of reasonable care, honesty, good faith and loyalty incumbent upon the defendants, they owed the duty of making or withholding expenditures from said fund with the motivating purpose and intent to assist or benefit the beneficiaries identified in the statute and without regard to the interests or desires of other persons, agencies or groups, except as those reasonably and necessarily would be considered in the management and expenditure of funds by private trustee or owners thereof or as might be mandatorily required by the laws or public policy of the State. The declaratory judgment further declared that the proper administration of said fund requires an effective canvass, expression and consideration of the views of the beneficiaries; and the proper administration and expenditure of said fund makes desirable the availability to the beneficiaries and their representatives of reasonably accurate, complete and current information concerning the receipts, expenditures and projects of the defendants.

11. This duty is declared in the judgment and seems one inherent in the responsibilities of a Commission charge to act for the benefit of persons who, while wards of the government in a sense, cannot be considered as infants, incompetents or other persons acting under similar disabilities. It is interesting in this connection to note that Congress in setting up comprehensive legislation to guide the expenditure of gas royalties in Executive Order Indian Reservations, which with other similar statutes may be deemed in pari materia with the one in question, provided that the fund should be used for certain administrative expenses and for

have not discharged their duty in that respect. Their performance toward the Indians has been niggardly, reluctant and at times almost defiant; and it is no answer to say that the information could be ferreted out from their records by the plaintiffs.[12]

The plaintiffs are largely unschooled and untrained and it is apparent from the evidence that their legal representative has done much of the work he has done on their behalf on credit. Ordinary business responses even as to him do not seem to have been forthcoming. The defendants retain an administrative assistant and legal adviser, presumably for the benefit of the Indians, they have a field representative and they employ two clerical assistants at the Capitol. The Commission members themselves have adequate trust funds for such travel or additional assistance as might be necessary to considerately administer the fund. It does not seem unreasonable, indeed it seems essential, to recognize that a program for the affirmative disclosure of available information as to the plaintiffs is indispensable for the proper discharge of the defendants' trust and that no reason whatever appears why the defendants, particularly after the entry of the prior judgment, should have failed so utterly to carry out the affirmative spirit and letter of their obligation in the respects mentioned. I think much of the misunderstanding that has resulted in and prolonged this litigation must be

ascribed to the attitude of the Commission.

The plaintiffs and those they represent, in line with the judgment declaring it to be the duty of the defendant Commission to adopt an affirmative program for the benefit of the beneficiaries of the trust, have suggested a series of projects for improving the economic condition of the beneficiaries of the trust.[13] In an effort to facilitate the execution of such a program they have organized themselves into a Utah corporation known as the Kayielli Navajo Co-Operative Association. They have suggested that summer range be acquired for their livestock and that the livestock herds be increased to permit profitable and economic operations; that consideration be given to the establishment of a modern game bird hatchery on Montezuma Creek; that caterpillar tractors and other equipment be acquired for the purpose of constructing livestock watering dams and reservoirs, for the construction of contours and other suitable range improvement work, and for the maintenance of the Indian roads to meet their limited needs; that Indian men be trained in the operation of such equipment; that suitable meeting facilities be established and that other constructive uses of the trust fund be made.

It is not the court's province to pass upon such further proposals except to see that the views of the Indians be given proper consideration. But the Commis-

---

the use and benefit of the tribe of Indians for whose benefit the reservation was created, "Provided, that said Indians, or their Tribal Council, shall be consulted in regard to the expenditure of such money * * *" The statute with which we are concerned does not make the entire Navajo Tribe beneficiaries and hence, by analogy, those residing on the Aneth Extension should be consulted.

12. The chairman of the Commission, despite the declaratory judgment to the contrary, persisted at the supplemental hearing in his view that the Commission had no duty to keep the Indians informed of the expenditure of these funds beyond permitting them to examine personally

the State records. He said "We haven't rendered an accounting to anyone except the State records."

13. It has been recognized in another context that the general congressional intent is to lodge with the responsible agency the power to adopt long range programs for Indian beneficiaries of trust funds which cannot be accomplished by disconnected efforts. Lane v. Morrison, 246 U.S. 214, 38 S.Ct. 252, 62 L.Ed. 674 (1918). But the discretion to adopt long range programs should not be permitted in line with defendants' argument to justify no program at all pending some possibility of further legislative enactment.

sion's objections that some or all of such projects would involve administrative problems does not seem determinative against their consideration, since one of the reasons the Commission was appointed with continuing authority to employ administrative assistance was to provide for varying administrative problems. The objection that the amount of the trust funds committed for the benefit of the Indians within the Aneth Extension is excessively large so that some wider distribution of the funds should be accomplished seems inconsistent with the idea that there are no resources with which to meet limited administrative problems on the small scale contemplated by the present statute.

Be this as it may, the explanation of the Commission during the first hearing that there had been insufficient time to fully explore and consider the possibilities of such projects has become more or less moot. The evidence now shows without dispute that the Commission from shortly after the entry of the declaratory judgment actively has sponsored legislation to extend the benefits of the fund to other Indians,[14] and that pending final action on this legislation it has assumed to suspend any judgment or activity with regard to an affirmative program for the benefit of the Indians and declined to consider expenditures that might otherwise appear to them for the benefit of the Indians. The court concludes that the defendants are failing in accordance with the judgment to consider in good faith expenditures for the benefit of the Indians residing in the Extension.

I, of course, do not question the right of the Commission or the defendants as individuals to respond to any inquiries from the members of The Congress or any State agency, or any other agency State or Federal, or to make available to any member or committee or agency

---

14. Senator Wallace F. Bennett, whose dedication to the legitimate interests of the Indians cannot be doubted, introduced the bill in question, S. 2384. It may be inferred from the record that this bill was initially introduced at the suggestion of Navajo Tribe Officers or the defendant Commission or both; but in any event it is apparent that Senator Bennett was not advised at the time of the viewpoint of the plaintiffs herein, since in a letter to the chairman of the Indian Affairs Sub-Committee he stated that the bill was "non-controversial".

In a letter dated June 21, 1962, to Congressman David S. King, and apparently unsolicited by him, and signed by "State Indian Affairs Commission by Frank J. Allen, Administrative Assistant" it is stated: "Early in the session the subject bill was introduced to amend the act of March 1, 1933 * * * by permitting the state to use the royalty funds for the benefit of all the Navajo Indians on the reservation in Utah and would remove the restrictions upon the manner in which the money might be beneficially used.

"We feel the passage of this Bill is very much in the interest of the Navajo people in Utah because the lands added by the 1933 Act in the area north of the San Juan River have no settlements upon them and there are very few people who could be said to reside therein. There are settlements in the 1933 addition below the river but this area is very sparsely populated. Further, the language of the 1933 act seems to limit educational benefits to the payment of tuition * * *

"The Navajo Tribe has requested that we advise you of our conviction that this proposed amendment could be conducive of a more fruitful employment of the royalty funds by the State of Utah. There are presently very few beneficiaries (estimates are as low as 2,000) of this four million dollar fund.

"We should very much appreciate any assistance you can give in effecting the passage of S. 2384 in this session. You will doubtlessly receive additional communication on this subject from representatives of the Navajo Tribe in the near future."

On June 26, 1962, Congressman Petersen acknowledged what apparently was a similar letter to him from Mr. Allen, the Congressman, letter being addressed to Mr. Allen as "Administrative Assistant, State Indian Affairs Commission."

On November 23, 1962 Senator Bennett wrote Mr. Allen stating that he "would be happy to re-introduce the bill on which you wrote No. 21." It is apparent from this letter that Mr. Allen was still pressing the matter, rather than merely being called on for comments.

their views with regard to needed legislation or any other subject. I leave any personal question in relation to a trustee's voluntary sponsorship of legislation contrary to the interests of the present beneficiaries of the fund to the individuals concerned. However, I do not believe that the defendants as trustees or as administrators of that fund have the right, contrary to the declaratory judgment, to suspend or abandon their duties pending the possibility of enacting legislation which might reduce the interest of the plaintiffs as beneficiaries of the fund even apart from constitutional questions that might be involved.[15]

The court finds that the plaintiffs in order to protect said fund for the purposes for which it was intended, and in order to prevent the unauthorized use of the fund by the defendants, justifiably brought the original action herein and have justifiably brought these supplemental proceedings; and that in the protection of the fund they have reasonably incurred attorneys' fees in the sum of $20,000, which are reasonable attorneys' fees for the services of attorneys for the plaintiffs herein to date, together with taxable costs herein. If the Indians are deprived of legal representation or the means to employ and to cooperate with attorneys, not only their own interests as beneficiaries, but the fund itself will be in jeopardy and its purpose frustrated. These are found to be reasonable charges against the fund and it is concluded that this court has jurisdiction to order and direct their payment from said fund.

The defendants contend that costs cannot be awarded against the State and that no other relief would be appropriate in these proceedings because it would go beyond the pleadings.[16] They say that Section 2202 is limited to the granting of coercive relief on issues and evidence presented in the main case, or incidental thereto, and may not extend to the receipt of "new issues and controversies not properly before the court".

Suffice it to say that the relief to be granted herein, including the award of costs and attorneys' fees [17] is believed to

15. McGee v. Mathis, 4 Wall 143, 71 U.S. 143, 18 L.Ed. 314.

16. The complaint in the main action alleged among other things that the plaintiffs were concerned that unless an order defining what may or may not be done with the fund is made the same will be expended and reduced without any material advantage to the plaintiffs and that a substantial part will be used to divert the benefit to persons not of plaintiffs' class and will place plaintiffs in the condition in which they lived prior to the time the fund came into existence. It was prayed among other things that the rights and legal relationship of the parties with respect to the fund be declared; that the plaintiffs be kept advised of receipts, expenditures and projects; that temporary restraints be entered as against expenditures from the fund and that such other, further or different relief as appeared to the court meet and equitable be granted.

17. The argument that this court assumed jurisdiction pursuant to Section 78-11-9 Utah Code Annotated, 1953, thus precluding the award of costs against the State of Utah, overlooks the fact that the Federal question jurisdiction pursuant to 28 U.S.C. § 1331 is involved, the State statute being involved only against the possibility of the State claiming an interest in the fund in question and asserting sovereign immunity. The State has claimed no such interest and has not asserted sovereign immunity. No award of either costs or attorneys' fees is made as against the State or anyone else other than out of the fund, in which the State claims no interest, and which has been held to be a trust fund for the benefit of the plaintiffs and those whom they represent. These funds do not belong to the State of Utah nor are they public funds anymore than the lands involved in Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507, supra, were public lands. See also Hanson v. United States, 153 F.2d 162 (10 Cir., 1946) ; 28 U.S.C.A. § 1331 as interpreted in Gully v. First Nat. Bank in Meridian, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70. See also Williams v. Clinton, 83 F.2d 143 (10 Cir., 1936) ; and Hanson v. Hoffman, 113 F.2d 780 (10 Cir., 1940), and United States v. Pierce, 235 F.2d 885 (9 Cir., 1956), cf. Viles v. Symes, 129 F.2d 828 (10 Cir., 1942), and State of Utah v. United States, 304 F.2d 23 (10 Cir., 1962). See also

be clearly within the power and duty of the court.[18]

In general the situation of the Navajo Indians is a sad and difficult one. Even when the policies of the government toward them have been benevolent and have been administered with an understanding and compassionate hand, limitation of funds, facilities, time and other considerations frequently have rendered efforts still inadequate to cope with ages-old disease, ignorance and want. To the extent that the administration of Indian affairs is not benevolent and understanding, the plight of the Indians becomes doubly pitiable.

The Navajos living on the Aneth Extension particularly live in abject poverty and want.[19] They are confined largely to an arid desert wasteland, almost unusable for their livestock during hot weather. Adjoining the reservation however, are higher ranges and ranches, available for purchase, which seem to offer suitable summer range for livestock upon which the Indians so desperately depend. The defendant Commission has for its primary justification, purpose and function, the administration and expenditure of a very substantial fund provided by Congress for the benefit of these very Indians.

The defendants Commissioners occupy an enviable position, in contrast with numerous other administrators whose humanitarian desires too frequently are handicapped by lack of available funds or power. They have at their disposal for the benefit of the Indians whom they are committed to help, a fund of several million dollars. At the end of the last fiscal year, July 1, 1961 to June 30, 1962, the net amount of the fund was $3,525,086.83. Income of the fund during that year was $576,066.84. Their interest and duty are not impracticably diffused over large areas or among numerous beneficiaries but focus upon a relatively small area and a limited number of beneficiaries. These beneficiaries are needful of help. They are not seeking handouts but ask only for basic economic and cultural assistance to enable them better to safeguard their health and to provide food and shelter for themselves and their children.

A final decree of court has confirmed not only the wide discretion of the Commission to extend help, but their duty to do so. And the court, to encourage compliance with such duty without subjecting state officials to undue restrictions, used precatory but nonetheless definite language to indicate methods by which the statutory duty of the Commission could be carried out appropriately. These included the maintenance of closer liaison and more sympathetic contact with the beneficiaries for whom the fund was to be administered, and a program to keep them better informed and to obtain their views concerning projects designed to assist them.

If there were ever a humanitarian dream come true, if there were ever an opportunity for proof in this country

Anno.—Costs and Fees—Trust Litigation, 9 A.L.R.2d 1132; cf. Duchesne County v. State Tax Commission, 104 Utah 365, 140 P.2d 335 (1943).

18. Security Insurance Company of New Haven v. White, 236 F.2d 215, (10 Cir., 1956); cf. Edward B. Marks M. Corp. v. Charles K. Harris M. P. Co., 255 F.2d 518 (2 Cir., 1958); The State of Indiana et al. v. Springfield Township in Franklin County, 6 Ind. 83. See also 16 Am. Jur., Declaratory Judgments, § 78, pp. 342–343; Annotation 101 A.L.R. 689, and Lowe v. Harmon, 167 Or. 128, 115 P. 2d 297 (Ore.1941).

19. The court found in the main action: "Plaintiffs and those whom they represent live in mud hogans with dirt floors and with no utilities. They exist under common conditions of malnutrition and in such poverty as, measured by white men's standards, amount to abject and extreme want. They do not live in towns or communities, but rather their hogans are widely separated from each other, and they graze their livestock on land surrounding their hogans. The diet of these Indians consists primarily of meat which they secure from the animals which remain in their herds after they have sold what is deemed essential to provide funds for the other urgent necessities of life."

that when Indians have been treated shabbily by government it is because of practical limitations rather than mere niggardliness, the situation of the Commission would seem to present them. Yet by rather clear proof in these supplemental proceedings it is shown that since the entry of the judgment the Commission has pursued largely its former course, having insufficient regard for the interests of the plaintiffs and those whom they represent as distinguished from others. Among other things, it has declined to exercise its judgment under the laws governing its functions; it has suspended the consideration of projects which could be most beneficial to those designated by the present federal and state laws, pending an effort on its part to effect a dilution of plaintiffs' rights.[20] The Commission has permitted itself to be influenced in this respect by interests out of harmony with its own duty, contrary to the declaratory judgment.[21]

The Federal and State statutes in general and this situation in particular raise delicate problems of division of powers, conflicting interest, and procedures. Perhaps the pending legislation has special merit in seeking to place the State Commission more closely in touch with the policies of the Department of the Interior and its commissioner of Indian Affairs; and the present case seems to raise a

question why the entire administration of the fund should not be turned over to the regular Federal agency. The latter, however, is a matter wholly within the competence of Congress. The present situation with which this court is confronted, notwithstanding the difficulties under the present law, seems to require on the part of the defendants greater heed to the spirit as well as the letter of the statute in question and other Federal laws in pari materia with it, a mere appropriate observance of the interests of the plaintiffs and a more suitable regard for the declaratory judgment of this court. Particularly is this so, since we are here not concerned with any incursion in fields ordinarily reserved to unconditional state discretion but with a matter peculiarly within Federal competence except for the delegation of conditional power to the State, and since the judgment has become final without any complaint concerning its provisions.

Being constrained to say this much beyond the somewhat abstentious comments contained in my original decision, which it now appears were not sufficiently emphatic to accomplish an adequate compliance,[22] it remains to direct such supplemental order as appears reasonably necessary, feasible and within my power, to render the declaratory judgment more

---

20. The Secretary of the Commission testified that "as long as there is a possibility of amendment we would have to see what the outcome was before we go ahead." The chairman indicated that he accepted the statement of the head of the Navajo Tribal Council that it would be better to wait until it could be determined whether the expenditure of the fund could be for the benefit of all of the Navajos in San Juan County.

21. The judgment declared: "That the determination of the needs and desires of the beneficiaries should not be dependent upon the views of officers or members of the Navajo Indian Tribe as a whole, although these views may be considered as among those that may throw light upon defendants' duties, together with these circumstances and views. It is necessary to bear in mind that the tribe as a whole is not the designated beneficiary of this fund and

that its interests and views may in some respects be in conflict with the more pertinent interests and views of the beneficiaries. The tribe also has responsibilities to its members, including the beneficiaries of the fund, but said fund is not intended, and may not be used, for general tribal purposes."

22. Perhaps of some little significance, but only as a sidelight in view of similar but more solid indications of the necessity of further relief, is the statement which it was testified Mr. Hurst, Field Representative of the defendant Commission, made to some of the Indians who call his attention to the declaratory judgment that he "didn't pay any attention to a small court". Mr. Hurst when he took the stand, either through oversight or design, failed to deny that he made such a statement.

effective, but which yet does not project the court into areas where it has no business to be.

It is concluded that the court by supplemental order and decree should:

1. Direct and order the defendants to proceed in good faith to exercise their discretion in administering and expending said fund in harmony with the principles and law hereinbefore declared, until, if at all, the said statute has been changed by Act of The Congress.

2. Direct and order the defendants to make available to the plaintiffs and to those whom they represent, through their counsel and other representatives designated by them monthly written reports showing the amount of said fund, new increments, administrative expenses charged against the fund, other expenditures or disbursements from the fund, commitments against the fund whether tentative or permanent but not expended, and a description of the projects which may involve future expenditures or disbursements from said fund which are under investigation or consideration by the Commission and concerning which the views of persons or agencies other than the defendant Commission or its members or staff are being received or sought.

3. Direct and order the defendants with all considerate speed to institute and carry out an effective program for the canvassing of the needs, desires and recommendations of the Indians resident upon said Extension with reference to expenditures from said fund and to make no further substantial expenditures or commitments therefrom until this is done except for reasonable administrative expenses, the tuitioning of Indian children residing upon said Extension in white schools, and emergency requirements; and as a part of said program to call meetings of said Indians residing upon the Extension of which reasonable notice in advance shall be given, for the purpose of which the services of qualified and reputable interpreters shall be available, and at which the Commission members or their representatives shall furnish comprehensive information concerning the administration of said fund and the problems, plans and policies of the Commission to the extent that they have been formulated or are under investigation, and at which meetings the Indians resident upon said Extension shall be afforded reasonable opportunity to ask questions and to receive explanations, and shall be permitted reasonably, to report to the Commission their views, recommendations, needs and desires with reference to said fund.

4. Direct and order the defendants to pay from said fund to plaintiffs for the use and benefit of their attorney as attorney's fees and expenses the sum of $20,000 (subject to such adjustment among plaintiffs and their counsel for attorney's fees advanced as may be reasonably agreed upon or subsequently approved by the court), and to direct that in addition there be paid by defendants from said fund the taxable costs.

5. Except as hereinabove mentioned, to deny injunctive relief to plaintiffs with reference to the expenditures or commitment referred to specifically in the foregoing findings.

The court's findings of fact and conclusions of law in the supplemental proceedings are deemed sufficiently indicated in this memorandum decision to satisfy the requirements of Rule 52, F.R.Civ.P. Counsel for the plaintiffs is hereby directed to prepare and serve within a period of ten days a proposed judgment in harmony with the foregoing conclusions, which will be settled by the court on a regular motion day, February 20, 1963.