## UNITED STATES *v.* JIM ET AL.

No. 71–1509.   Decided November 20, 1972*

PER CURIAM.

The motion of the Navajo Tribe of Indians for leave to file a brief as *amicus curiae* in No. 71–1509, is granted.

These cases are here on appeal from a judgment of the District Court for the District of Utah that declared an Act of Congress to be unconstitutional.   Jurisdiction in this Court is conferred by 28 U. S. C. §§ 1252 and 2101 (a).

In 1933, the Congress withdrew certain lands in Utah, known as the "Aneth Extension," from the public domain and added them to the Navajo Reservation.   Though no oil or gas was believed to be located on these lands, it was provided that should such mineral resources be produced in commercial quantities, "37½ per centum of the net royalties accruing therefrom derived from tribal leases shall be paid to the State of Utah: *Provided,* That said 37½ per centum of said royalties shall be expended by the State of Utah in the tuition of Indian children

---

*Together with No. 71–1612, *Utah et al.* v. *Jim et al.,* on appeal from the same court.

in white schools and/or in the building or maintenance of roads across the lands described in section 1 hereof, or for the benefit of the Indians residing therein." 47 Stat. 1418. The remaining 62½% of the royalties generated by any such tribal mineral leases were, by implication, to go to the Navajo tribe.

After the passage of the Act, oil and gas were discovered on the Aneth Extension, and royalties were divided pursuant to the statute. The State of Utah created an Indian Affairs Commission to manage and expend the funds received by the State under the Act. As time went on, the language of the 1933 Act came to create administrative problems regarding the expenditure of the funds channeled through the State. A report of the Senate Committee on Interior and Insular Affairs noted in 1967 that the word "tuition" in the 1933 Act had created uncertainty as to the breadth of the educational program the State was authorized to finance from the royalty funds. The report also noted a difficulty in discerning precisely who was properly a beneficiary of the funds, since "many Navajo families do not live permanently within the lands set aside in 1933, but move back and forth between this area and other locations." S. Rep. No. 710, 90th Cong., 1st Sess., 2 (1967).

To make the administration of these funds more flexible and to spread the benefits of the royalties more broadly among the Navajo community, the Congress enacted a statute in 1968 that directed the State to expend the 37½% of royalties "for the health, education, and general welfare of the Navajo Indians residing in San Juan County." 82 Stat. 121. This statutory change expanded the pool of beneficiaries substantially, and a class action was brought on behalf of the residents of the Aneth Extension, seeking *inter alia* a declaration that the statute was an unconstitutional taking of property without just compensation. The District Court concluded that the

1933 Act vested certain property rights in the plaintiffs, and held the 1968 Act, with its changed pool of beneficiaries, to be unconstitutional.[1]

The judgment of the District Court is in error. Congress in 1933 did not create constitutionally protected property rights in the appellees. The Aneth Extension was added to a tribal reservation, and the leases which give rise to mineral royalties are tribal leases. It is settled that "[w]hatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members." *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, 307; *Delaware Indians* v. *Cherokee Nation,* 193 U. S. 127, 136. To be sure, the 1933 Act established a pattern of distribution which benefited the appellees more than other Indians on the Navajo Reservation.[2] But it was well within the power of Congress to alter that distributional scheme.[3] In *Gritts* v. *Fisher,* 224 U. S. 640, this Court approved a congressional enlargement of the pool of Indians who were to benefit from a distribution of tribal property. There, too, an earlier statute had established a more limited entitlement.

> "But it is said that the act of 1902 contemplated that they [the beneficiaries under the first enactment] alone should receive allotments and be the participants in the distribution of the remaining lands, and also of the funds, of the tribe. No doubt

---

[1] The decision of the District Court is unreported.

[2] While the 1933 Act remained in effect, the District Court properly insisted that the Utah State Indian Affairs Commission comply with the statutory formula for disbursements. See *Sakezzie* v. *Utah Indian Affairs Comm'n,* 198 F. Supp. 218 (declaratory judgment); 215 F. Supp. 12 (supplemental relief).

[3] We intimate no view as to the rights a *tribe* might have if Congress were to deprive *it* of the value of *mineral royalties* generated by tribal lands.

such was the purport of the act. But that, in our opinion, did not confer upon them any vested right such as would disable Congress from thereafter making provision for admitting newly born members of the tribe to the allotment and distribution. The difficulty with the appellants' contention is that it treats the act of 1902 as a contract, when 'it is only an act of Congress and can have no greater effect.' . . . It was but an exertion of the administrative control of the Government over the tribal property of tribal Indians, and was subject to change by Congress . . . ." *Id.*, at 648.

Congress has not deprived the Navajo of the benefits of mineral deposits on their tribal lands. It has merely chosen to re-allocate the 37½% of royalties which flow through the State in a more efficient and equitable manner. This was well within the power of Congress to do. As no "property," in a Fifth Amendment sense, was conferred upon residents of the Aneth Extension by the 1933 Act, no violation of the Fifth Amendment was effected by the 1968 legislation. The judgment of the District Court is

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

Plaintiffs below are a class of Indians with a membership of 1,500. They are a mixture of Navajo and Piute and live in an area of the Navajo Reservation called the Aneth Extension, made part of that reservation in a 1933 Act of Congress. 47 Stat. 1418. In 1968 Congress amended that Act, 82 Stat. 121, and the District Court for the District of Utah declared the amendment unconstitutional.

Prior to 1933 the Extension was part of the public lands of the United States. The area was occupied by the direct ancestors of the appellees.

The Indians in the Aneth Extension number about 1,500 people who are primitive Navajos with some mixture of Piute blood. See *Sakezzie* v. *Utah Indian Affairs Comm'n,* 198 F. Supp. 218, 220. They live in a remote and relatively inaccessible area with an average annual income per family of $240. *Ibid.* The Aneth Extension is in San Juan County and the 1933 Act stated: "[N]o further allotments of lands to Indians on the public domain shall be made in San Juan County, Utah, nor shall further Indian homesteads be made in said county."

The white man was unconcerned about this domain until oil was discovered; and then he became quite active. By June 30, 1970, the royalties owing the Aneth Extension Indians had increased to $7,039,022.32. Of this, $78,000 was used to pipe water from the Aneth Extension to the adjoining lands of a white man, an "improvement" that only incidentally aided the resident Indians. Another $27,000 of Indian funds was spent for the construction of an airport and connecting road, which substantially benefited a white man's private dude ranch operation. Some $10,000 or more was expended for administrative purposes by Utah. 198 F. Supp., at 221. When this suit was started, additional expenditures were about to be made: $175,000 to a federal agency to locate isolated water springs on the Aneth Extension and $500,000 to build a hard-surfaced road outside the boundaries of the Extension.

These primitive Navajos wanted the money used to purchase high-elevation ranges where they might have summer grazing for the livestock and thus realize a round-the-year livestock operation. Judge Christensen found that members of the Aneth Extension were the sole beneficiaries of the fund and that it should be administered with their wishes in mind.

But there are tensions and conflicts between these primitive Navajos who live on the Aneth Extension and other members of the tribe who live elsewhere. 198 F. Supp., at 221.

The State Commission did not comply with the District Court's order but sponsored legislation to extend the benefits of the fund to other Indians.[1] Judge Christensen ruled again that the fund was solely for the benefit of members of the Aneth Extension. *Sakezzie* v. *Utah State Indian Affairs Comm'n,* 215 F. Supp. 12. Neither opinion was appealed. But the State Commission promoted legislation to extend the benefits of the 1933 Act to other Indians. *Id.,* at 20.

The problems the Commission had in administering the fund reached Congress and in 1968 the contested amendment was passed. 82 Stat. 121. This amendment indicates that money must be used by the State of Utah "for the health, education, and general welfare of the Navajo Indians residing in San Juan County" and that "Contribution may be made to projects and facilities within said area that are not exclusively for the benefits of the beneficiaries hereunder in proportion to the benefits to be received therefrom by said beneficiaries, *as may be determined by the State of Utah* . . . ." *Ibid.* (Emphasis added.)

The 1933 Act gave title to the land and right to the fund, *not* to the *tribe* of the Navajo, but to the Aneth

---

[1] The Act admitting Utah to the Union provided:

"That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof; and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." 28 Stat. 108.

community.[2]  I do not believe that under the circumstances of this case Congress had the power to expand the class of beneficiaries to include the whole tribe.

The occupants of the Extension have been a separate community for many generations.  Their claim of right by continuous possession precedes the transfer of title by the United States Government.  Congress made provision for the Secretary of the Interior to place other tribes on the land and, if he did, their claim would be based on territory, not membership.  Since the rights were vested in those who lived on the Aneth Extension, I do not see how they can be extended to outsiders.

In *Gritts* v. *Fisher*, 224 U. S. 640, the Court upheld the power of Congress to expand the beneficiaries of certain Indian land to the children of those who already enjoyed those rights.  Here the expansion is not limited to those of the same blood line.  But, more important, Congress had a different legal relation to the Cherokees than it does to the appellees.  "[T]he members of this tribe were wards of the United States, which was fully empowered, whenever it seemed wise to do so, to assume full control

---

[2] That Act (47 Stat. 1418), after describing the Aneth Extension by metes and bounds, provided that those public lands "be, and the same are hereby, permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as the Secretary of the Interior may see fit to settle thereon: *Provided,* That no further allotments of lands to Indians on the public domain shall be made in San Juan County, Utah, nor shall further Indian homesteads be made in said county under the Act of July 4, 1884 (23 Stat. 96; U. S. C., title 43, sec. 190).  Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, $37\frac{1}{2}$ per centum of the net royalties accruing therefrom derived from tribal leases shall be paid to the State of Utah: *Provided,* That said $37\frac{1}{2}$ per centum of said royalties shall be expended by the State of Utah in the tuition of Indian children in white schools and/or in the building or maintenance of roads across the lands described in section 1 hereof, or for the benefit of the Indians residing therein."

over them and their affairs, to determine who were such members, to allot and distribute the tribal lands and funds . . . ." *Id.*, at 642. The 1933 Act states that the lands "are hereby, permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as the Secretary of the Interior may see fit to settle thereon." 47 Stat. 1418. That would seem to freeze the existing legal rights in that area of the Aneth Extension to the inhabitants. The legal effect seems like a disclaimer on the part of the United States of any right in either the land or the minerals. It is difficult for me to see how Congress has power to change the scheme without payment of just compensation. After all, Indians are beneficiaries of the Due Process Clause of the Fifth Amendment. *United States* v. *Creek Nation,* 295 U. S. 103; *Shoshone Tribe of Indians* v. *United States,* 299 U. S. 476. They too are people, not sheep or cattle that can be given or denied whatever their overseer decrees.

Indians are also beneficiaries of the Just Compensation Clause of the Fifth Amendment. *Chippewa Indians of Minnesota* v. *United States,* 305 U. S. 479; *United States* v. *Klamath and Moadoc Tribes,* 304 U. S. 119; *Sioux Tribe of Indians* v. *United States,* 316 U. S. 317. When there is a taking of Indian lands, the compensation must take into account the mineral rights which are part of the lands. *United States* v. *Shoshone Tribe of Indians,* 304 U. S. 111. What then constitutes a taking? The majority finds no taking because ownership already existed in the Navajo tribe. The 1933 Act states, however, that all lands are "permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as the Secretary of the Interior may see fit to settle thereon," 47 Stat. 1418. That Act plainly indicates that only those residing on that tract, not the tribe as a whole, were the beneficiaries.

If the royalty granted by the 1933 Act had been to the Standard Oil Co. or any other producer of oil, no one would dare say that the royalty could be assigned by a subsequent Congress to an oil consortium without payment of just compensation. Whenever we have made grants of public lands or interests therein to Indians the Court has held that the fact that Indians are wards and the United States a guardian does not make the Indian title defeasible. The Court in *Lane* v. *Pueblo of Santa Rosa,* 249 U. S. 110, 113, held that if the United States were allowed to take lands from Indians, "[t]hat would not be an exercise of guardianship, but an act of confiscation."

In *United States* v. *Creek Nation,* 295 U. S., at 109–110, the Court said:

> "The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government. But this power to control and manage was not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it was subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions. It did not enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them . . . ."

The present cases are close to *Shoshone Tribe of Indians* v. *United States,* 299 U. S. 476, where Congress repeatedly put Arapahoes on Shoshone lands acquired under a treaty. This Court, speaking through Mr. Justice Cardozo, allowed damages to the Shoshones:

> "Confusion is likely to result from speaking of the wrong to the Shoshones as a destruction of their

title. Title in the strict sense was always in the United States, though the Shoshones had the treaty right of occupancy with all its beneficial incidents. . . . What those incidents are, it is needless to consider now. . . . The right of occupancy is the primary one to which the incidents attach, and division of the right with strangers is an appropriation of the land *pro tanto,* in substance, if not in form." *Id.,* at 496.

And quoting from *United States* v. *Cook,* 19 Wall. 591, Mr. Justice Cardozo added,

"The right of the Indians to the occupancy of the lands pledged to them, may be one of occupancy only, but it is 'as sacred as that of the United States to the fee.' " *Id.,* at 497.

What power remains in Congress after the express purpose of the Act "permanently [to] withdraw" the lands from disposal?

Public lands are usually subject to disposition by patent and upon its issuance, control over the transaction ceases and the patent can only be set aside by judicial proceedings in the courts. *Michigan Land & Lumber Co.* v. *Rust,* 168 U. S. 589; *Moore* v. *Robbins,* 96 U. S. 530. Thus, when Congress passed legislation giving public lands to the railroads, it was considered a contract which could not be broken by Congress when it sought to use the lands as a water-power site, *Payne* v. *Central Pacific R. Co.,* 255 U. S. 228; nor could the Secretary reclaim the property. *United States* v. *Northern Pacific R. Co.,* 256 U. S. 51; *Santa Fe Pacific R. Co.* v. *Fall,* 259 U. S. 197, 199. An entryman on a homestead claim does not achieve title until certain time and work conditions are met. 43 U. S. C. §§ 161–165. Yet, during this period he has the right to exclusive possession and use, unless the patent was secured by fraud. Patents

are not issued in oil and gas exploration but leases are. 30 U. S. C. § 226. But that fact does not affect the power to cancel the leases. That can only be done by a failure of the lessee to comply with the lease, the statute, and regulations. 30 U. S. C. § 188. *Pan American Petroleum Corp.* v. *Pierson,* 284 F. 2d 649.

Until lands are patented, title remains in the United States. Yet even before a patent issues the claims are "valid against the United States if there has been a discovery of mineral within the limits of the claim, if the lands are still mineral, and if other statutory requirements have been met." *Best* v. *Humboldt Mining Co.,* 371 U. S. 334, 336.

The devices for doing the Indians in, when it comes to royalties in gas or oil lands, are numerous. See *White* v. *Sinclair Prairie Oil Co.,* 139 F. 2d 103. But the owners of oil and gas interests (whether those interests be legal or equitable) normally have an interest separate and apart from the land where the oil and gas are discovered. See *Lane* v. *Hughes,* 228 S. W. 2d 986; 3 E. Kuntz, Oil and Gas, cc. 38 and 42 (1967); V. Kulp, Oil and Gas Rights § 10.36 *et seq.* (1954). It is strange law, indeed, when the guardian (the United States) is allowed to do in the wards (the Indians) by depriving them of their equitable interest in the oil royalties which had been granted or by reducing their share of the royalties granted.

The problems of this case are typical of those that have plagued the Indians from the beginning. We should put the cases down for oral argument to make certain that these primitive Navajos receive the full benefit of the law.