PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 12/31/96**

TENTH CIRCUIT

---

JAKE C. PELT, DAN BENALLY, JIM
BENALLY, HELEN CLY, and FRED
JOHNSON for themselves and on behalf
of a class of persons consisting of all
Navajo Indians residing in San Juan County,
Utah, including a sub-class of persons
consisting of all other Indians the Secretary of
the Interior saw fit to settle on lands described
in the 1933 Act prior to May 17, 1968,

    Plaintiffs-Appellants,

and

the NAVAJO NATION,

    Intervenor-Appellant,

v.

STATE OF UTAH,

    Defendant-Appellee.

No. 95-4135
No. 95-4136

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 92-C-0639-S)

---

John P. Pace, (Brian M. Barnard and Parker M. Nielson, with him on the brief), Salt Lake
City, Utah, for the Plaintiffs-Appellants.

Luralene D. Tapahe, Attorney for the Navajo Nation Department of Justice (Herb Yazzie,
Attorney General for the Navajo Nation Department of Justice, and Steve Bloxham,

Attorney for the Navajo Nation Department of Justice, with her on the brief), Window Rock, Navajo Nation, Arizona, for the Intervenor-Appellant.

Debra J. Moore, Assistant Attorney General for the State of Utah, (Jan C. Graham, Attorney General for the State of Utah, and Carol Clawson, Solicitor General for the State of Utah, with her on the brief), Salt Lake City, Utah,  for the Defendant-Appellee.

Lois J. Schiffer, Assistant Attorney General, Edward J. Shawaker and David C. Shilton, Attorneys, Department of Justice, Washington D.C., on the brief, for the United States of America as Amicus Curiae.

---

Before BALDOCK, HOLLOWAY, and MURPHY, Circuit Judges.

---

BALDOCK, Circuit Judge.

---

In these appeals, we must determine whether An Act to Permanently Set Aside Certain Lands in Utah as an Addition to the Navajo Indian Reservation, and for Other Purposes, 47 Stat. 1418 (1933), as amended by Pub. L. No. 90-306, 82 Stat. 121 (1968) (hereinafter "the 1933 Act"),[1] implied a cause of action for breach of fiduciary duty. Jake C. Pelt, Dan Benally, Jim Benally, Helen Cly, and Fred Johnson (hereinafter "Plaintiffs"), beneficiaries of a government fund created by the 1933 Act, assert that the district court erred by dismissing their complaint against Defendant State of Utah. The

---

[1]    The Act's relevant portion states:

> Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, 37½ per cent of the net royalties accruing therefrom derived by tribal leases shall be paid to the State of Utah: Provided, That said 37½ per cent of said royalties shall be expended by the State of Utah for the health, education, and general welfare of the Navajo Indians residing in San Juan County. Planning for such expenditures shall be done in cooperation with the appropriate departments, bureaus, commissions, divisions, and agencies of the United States, the State of Utah, the County of San Juan in Utah, and the Navajo Tribe, insofar as it is reasonably practicable, to accomplish the objects and the purposes of this Act. Contribution may be made to projects and facilities within said area that are not exclusively for the benefits of the beneficiaries hereunder in proportion to the benefits received therefrom by said beneficiaries, as may be determined by the State of Utah through its duly authorized officers, commissions, and agencies.

An Act to Permanently Set Aside Certain Lands in Utah as an Addition to the Navajo Indian Reservation, and for Other Purposes, 47 Stat. 1418 (1933), as amended by Pub. L. No. 90-306, 82 Stat. 121 (1968) .

Navajo Nation (hereinafter "Tribe") claims that the district court also erred in dismissing its complaint in intervention. The district court dismissed Plaintiffs' and the Tribe's complaints pursuant to Rule 12(b)(6), holding that they failed to state a claim upon which relief could be granted. Plaintiffs argue that the 1933 Act created a trust and a private cause of action in favor of the beneficiaries and that the district court erred by utilizing the "clear statement" rule in dismissing the complaint.[2] The Tribe asserts that it does have its own cause of action and that it may stand in the place of the United States to enforce the 1933 Act. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

We must determine the allocation of rights and responsibilities arising from the Act of March 1, 1933, 47 Stat. 1418 (1933) as amended by Pub. L. No. 90-306, 82 Stat. 121 (1968), which added a portion of land called the Aneth Extension to the Navajo

---

[2] Plaintiffs and the Tribe also argue that; based on three previous cases, United States v. Jim, 409 U.S. 80 (1973), Bigman v. Utah Development Corp., No. C-77-0031 (D. Utah Sept. 25, 1977), and Sakezzie v. Utah Indian Affairs Comm'n, 198 F. Supp. 218 (D. Utah 1961) supp. op. 215 F. Supp. 12 (1963), collateral estoppel and res judicata preclude the State's litigation of the questions of whether a right of action exists and in whom any cause resides. As to Plaintiffs, it is unnecessary for us to decide this question in light of our holding today. As to the Tribe, there is a total lack of identity of issues as none of the previous suits involved the question of tribal standing to enforce rights under the 1933 Act. Thus, application of collateral estoppel would be inappropriate. See Frandsen v. Westinghouse Corp., 46 F.3d 975, 978 (10th Cir. 1995) (explaining that "collateral estoppel requires an identity of issues raised in successive proceedings and the determination of these issues by a valid final judgment to which such determination was essential").

Reservation.  The crux of the dispute concerns Congress' intention in passing these laws. In ascertaining Congress' intent, it is helpful to examine the circumstances surrounding the problems that Congress was addressing.  See  Commissioner v. Engle, 464 U.S. 206, 217 (1984) ("The circumstances of the enactment of particular legislation may be particularly relevant" to the interpretation of a statute).  We thus begin with a brief look at the history of the Navajo Tribe and its dealings with the United States of America.

Although the subject of some disagreement, we know that Athapaskan speaking people, the predecessors of the Apache and the Navajo tribes, arrived in the Southwest sometime after the eleventh century A.D.  10 Handbook of North American Indians 508 (Alfonso Oritz ed. 1983).   The Navajo immigration to the Southwest was not in the manner of a mass movement, but rather was a piecemeal journey by smaller groups.  Ruth M. Underhill, The Navajos 12-13 (1956).  The Navajos' predecessors had led a nomadic life of hunting and fishing.  Id. at 5-6.  By the late eighteenth century, the Navajos had established a society which relied heavily on sheepherding for sustenance.  Id. at 59-60. Thus, the members traveled and lived in small clan-oriented groups.  Id.  At the time of the United States' entry into the Southwest in the 1840s, the Navajo culture was characterized by a scattered settlement pattern and lacked any centralized form of tribal government.  Aubrey W. Williams, Jr., Navajo Political Process 4 (1970).  In 1864, United States' conflicts with the Navajo people had culminated in the decision to relocate them to Bosque Redondo in the New Mexico territory, away from their homelands.

5

Gerald Thompson, The Army and the Navajo 27 (1976).  By March of 1865, over 9,000 Navajos had been relocated by Kit Carson and were forced to live communally at Bosque Redondo, Handbook, supra, at 51, thus fostering a sense of tribal unity in the Navajos who were there. Thompson, supra, at 164.  However, a number of Navajo clans refused to be relocated and fled north into areas in present-day Utah; one such area is the Aneth Extension.  Addition to the Western Navajo Indian Reservation: Hearings on S. 3782 Before the Committee on Indian Affairs, 71st Cong., 2d Sess. 2, 13 (1930);  see also Handbook, supra, at 514.  This varied history has led to an alleged divergence in the interests of the residents of the Aneth Extension and the Tribe.  In fact, until the 1933 Act was passed, the majority of residents of Aneth had never lived on the Navajo Reservation.  Hearings on S. 3782, supra, at 13.

In 1930, a bill was introduced in the Senate to add the Aneth Extension to the Navajo Reservation.  The bill provided that 37½ % of any net oil and gas royalties accruing from the Aneth Extension be paid to Utah "Provided, That . . . said royalties shall be expended by the State of Utah in the tuition of Indian children in white schools and/or in the building or maintenance of roads across the [Aneth Extension], or for the benefit of the Indians residing therein." 47 Stat. 1418.  Notable royalties first began to be generated from these lands in the 1950s.  Sakezzie v. Utah Indian Affairs Comm'n, 198 F. Supp. 218, 219-20 (D. Utah 1961) supp. op. 215 F. Supp. 12 (1963).  Soon after the beginning of major oil and gas production in these areas, disputes began to arise as to

6

what purposes the fund monies should be applied.  See generally id.  These disagreements culminated in a lawsuit commenced by the beneficiaries of the fund against the Utah Indian Affairs Commission, Utah's administrative body responsible for the fund.  Id. at 219.  In Sakezzie, the beneficiaries challenged a number of spending decisions made by the commission.  Id. at 220-23.  Ultimately, the District Court for Utah rendered a decision wherein it required the State to make an accounting of the funds and their expenditure and construed the statute so as to restrict certain uses of the fund and expand the availability of other uses.  See id. at 225-26.  In partial response to these past disputes, the 1933 Act was amended in 1968[3] to address three perceived problems:

_____

[3]        The 1968 Act stated that the 1933 Act:

is amended by deleting all of that part of the last proviso of said section 1 after the word "Utah" and inserting in lieu thereof: for the health, education, and general welfare of the Navajo Indians residing in San Juan County.  Planning for such expenditures shall be done in cooperation with the appropriate departments, bureaus, commissions, divisions, and agencies of the United States, the State of Utah, the County of San Juan in Utah, and the Navajo Tribe, insofar as it is reasonably practicable, to accomplish the objects and the purposes of this Act.  Contribution may be made to projects and facilities within said area that are not exclusively for the benefits of the beneficiaries hereunder in proportion to the benefits received therefrom by said beneficiaries, as may be determined by the State of Utah through its duly authorized officers, commissions, and agencies.  An annual report of its accounts, operations, and recommendations concerning the funds received hereunder shall be made by the State of Utah through its duly authorized officers, commissions, or agencies, to the Secretary of the Interior and to the area

7

> First, differences in interpretation of the word "tuition" in the statute have resulted in litigation which leaves the commission in doubt as to how broad an educational program it may administer, especially in areas not now covered by federal school aid legislation. Second, road construction is difficult to plan when the roads under construction may be built only within rather narrowly defined areas. Third, many Navajo families do not permanently reside within the lands set aside in 1933, but move back and forth between this area and other locations. The 1933 Act requires that [Navajos] be 'residents' in order to qualify for help in the expenditure of the commission's funds, thus disqualifying a number of Indians from the commission programs . . . .

S. Rep. No. 710, 90th Cong., 1st Sess. 2 (1967). In response to the passage of the 1968 Amendment, a number of fund beneficiaries[4] brought suit claiming that the 1968 Amendment, because it expanded the group of beneficiaries, unconstitutionally deprived them of property without compensation. United States v. Jim, 409 U.S. 80 (1972) (per curiam). The Supreme Court, in Jim, held that these beneficiaries had no vested property interest and thus no property within the Fifth Amendment. In 1978, the beneficiaries brought suit in Bigman v. Utah Navajo Dev. Council, Inc., No. C-77-0031 (D. Utah Sept. 25, 1978), alleging misuse of trust funds. This case terminated in a consent decree requiring an accounting of the funds spent. Finally, in 1992, Plaintiffs brought the

---

> director of the Bureau of Indian Affairs for the information of said beneficiaries.

Pub. L. No. 90-306, 82 Stat. 121 (1968) (hereinafter "1968 Amendment").

[4]     Under the 1933 Act, the beneficiary class was comprised of Navajo residents of the Aneth Extension, a small parcel of land lying within San Juan County. The 1968 Amendment expanded this class to include all Navajo residents of San Juan County.

present suit in order to once again challenge the manner of disbursement and handling of trust funds. With this background in mind, we turn to the resolution of the case at bar.

II.

In June 1992, Plaintiffs filed a verified complaint in Utah state court alleging that the State had breached various fiduciary duties during its administration of the San Juan County Navajo royalty fund. The State then removed the case to federal district court and filed a motion to dismiss the complaint pursuant to Rules 12(b)(6) and 12(b)(7). The motion asserted that Plaintiffs did not have a private cause of action, did not have standing to bring this action, and that Plaintiffs had failed to join indispensable parties, namely, the United States and the Navajo Tribe. Plaintiffs responded by filing a motion for partial summary judgment on the same issues. Subsequently, Plaintiffs filed a motion to remand to state court for lack of jurisdiction claiming that the Eleventh Amendment barred the litigation of this monetary damages suit in the federal courts. The State responded by affirmatively waiving its Eleventh Amendment immunity in this case. After briefing was concluded on the motions for summary judgment and to dismiss, the district court ordered Plaintiffs to invite the United States and Navajo Tribe to intervene. The United States declined to intervene,[5] but the Navajo Nation Tribe filed a complaint in intervention to which the State responded with a motion to dismiss on the same grounds

---

[5]     Although the United States declined to intervene, it did file an amicus brief in support of Plaintiffs.

as were raised in its motion to dismiss Plaintiffs' complaint. At the conclusion of briefing, the district court ruled that neither Plaintiffs nor Tribe had a cause of action against the State. Plaintiffs and the Tribe then took this appeal.

## III.

This case presents the question of whether Plaintiffs, the Tribe, or both have a cause of action for breach of duty against the State under the 1933 Act and federal common law trust principles. Cf. United States v. Mitchell, 463 U.S. 206 (1983) (utilizing common law trust principles in the resolution of federal Indian issues). If that cause of action exists, the next question is: what rights are to be vindicated by the cause. In addition, the Tribe presents us with the question of whether it may bring a cause of action in the stead of the United States under 28 U.S.C. § 1362.[6] As the availability of a cause to each appellant is a distinct question, we will discuss the dismissal of Plaintiffs' complaint first and then proceed to resolve the question with respect to the Tribe. Finally, we will address the State's contentions[7] as appropriate.

---

[6] This is a federal jurisdictional statute which states: "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1362.

[7] The State asserts as an alternative basis for dismissal that the 1933 Act violates the Tenth Amendment. If the Act were determined to violate the Tenth Amendment, there would remain a serious question whether the State is accountable for funds previously received. As a consequence of these ramifications, the State's Tenth Amendment theory arguably necessitates a cross-appeal for this court to address the issue at this time. See Morely Constr. Co. v. Maryland Casualty Co., 300 U.S. 185, 191, 193

10

IV.

Our standard of review from a dismissal of a complaint for failure to state a cause of action is de novo. See Ash Creek Mining Co. v. Lujan, 969 F.2d 868, 870 (10th Cir. 1992). Under Rule 12(b)(6), dismissal is inappropriate unless the plaintiff can prove no set of facts in support of his claims to entitle him to relief. See Morgan v. City of Rawlins, 792 F.2d 975, 978 (10th Cir. 1986). Moreover, we owe no deference to the district court's ruling. Daigle v. Shell Oil Co., 972 F.2d 1527, 1539-40 (10th Cir. 1992). Thus, we scrutinize the complaint from the same perspective as the district court. Boise City Farmers Coop v. Palmer, 780 F.2d 860, 866 (10th Cir. 1985). The granting of a motion to dismiss "must be cautiously studied, not only to effectuate the spirit of the

(1937); University of Maryland v. Peat Marwick, Main & Co., 923 F.2d 265, 277 (3rd Cir. 1991); but see Massachusetts Mutual Life Ins. Co. v. Ludwig, 426 U.S. 479, 480-81 (1976). We, accordingly, choose not to address either the difficult issue of whether the claim is properly before us at this time or the complexities of the substantive Tenth Amendment question because the district court has not yet dealt with this matter. We see substantial benefit to the district court first addressing the Tenth Amendment issue and thus remand this question for further development of the issues inherently involved in such a weighty claim. See Singleton v. Wulff, 428 U.S. 106, 120-21 (1976).

The State also cited throughout its brief and in its submissions of supplemental authority several Eleventh Amendment cases. While we note that the State is correct in its assertions that the Indian Commerce Clause does not empower Congress to abrogate the states' Eleventh Amendment immunity from suit, see Seminole Tribe v. Florida, 116 S. Ct. 1114, 1119 (1996), these arguments are not pertinent to the case at bar as the State chose to waive its Eleventh Amendment immunity in order to obtain a federal forum. See Johns v. Stewart, 57 F.3d 1544, 1553 (10th Cir. 1995) (noting that a state may expressly waive its Eleventh Amendment immunity and consent to federal jurisdiction).

11

liberal rules of pleading but also to protect the interests of justice." Morgan, 792 F.2d at 978 (citation omitted). Cognizant of this standard, we proceed to the merits.

V.

A. The Individual Plaintiffs

Whether Plaintiffs have a cause of action against the State for breach of fiduciary duty is a matter of statutory interpretation and application of federal common law. We must determine whether Congress intended to create trust-like rights and responsibilities when it passed the 1933 Act and how it intended to alter that structure when it passed the 1968 Amendment.

The State claims that Plaintiffs have neither an express nor an implied right of action under the 1933 Act. Therefore, the State asserts, Plaintiffs cannot enforce the terms of the Act. The district court agreed and, utilizing the implied right of action test from Cort v. Ash, 422 U.S. 66 (1975), along with an analysis of Native-American and common-law trust jurisprudence, ruled that Plaintiffs did not have a private right of action. We note that the statute does not affirmatively delineate the enforcement mechanisms available under it. Accordingly, we proceed directly to the gravamen: Is an implied right of action created under this statute?

We perceive the issues of whether the 1933 Act and the 1968 Amendment create a common-law trust and whether there is an implied right of action as interrelated and

12

interdependent and thus analyze the question utilizing <u>Cort</u> and its teachings.[8]  In <u>Cort</u>, the Supreme Court set forth a four-part test to be used in determining whether a party has an implied right of action.  A court must determine (1) whether the statute creates a federal right in favor of the plaintiff; (2) whether there is any legislative intent, either explicit or implicit, favoring the creation or the denial of the right; (3) whether the right is consistent with the legislative scheme and its underlying purposes; and (4) whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law.  <u>Id.</u> at 78.  This test examines whether a right of action necessarily and logically flows from the statute at issue and whether that right would unduly implicate federalism concerns by impinging upon a state's police powers.

1.

In applying <u>Cort</u>'s first query, we conclude that the 1933 Act and the subsequent 1968 Amendment were for Plaintiffs' benefit.  The 1933 Act added the Aneth Extension to the Navajo Reservation.  Contemporaneous with that grant, the statute specifically reserved the 37½% royalty fund from the Tribal lease income and dedicated it to the benefit of the Navajos who resided in the Aneth Extension.  <u>See</u> <u>State of Utah v. Babbitt</u>,

---

[8]     While we note that the Supreme Court has essentially unified <u>Cort</u>'s analysis into a single question, <u>see</u> <u>Transamerica Mortgage Advisors, Inc. v. Lewis</u>, 444 U.S. 11, 15-16 (1979) (framing inquiry as a quest to determine whether Congress intended to create the private remedy), we find that <u>Cort</u>'s analysis is still very instructive in answering this penultimate question.

53 F.3d 1145, 1149 (10th Cir. 1995) (noting Congress' clear intent that oil and gas development on the Aneth Extension benefit San Juan Navajos). During the committee proceedings in 1930 considering the predecessor of the bill that was finally passed in 1933, there was discussion of the unique heritage of the Navajos who resided on the Aneth Extension and the divergence of their interests with the Tribe as a whole. See Hearings on S. 3782, supra, at 2, 13. Moreover, the 1933 Congress and Utah's Governor were cognizant of the Aneth residents' separation from the Tribe and wished to provide for these individuals. See Hearings on S. 391 Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs, 90th Cong., 1st Sess. 10 (1967).

In 1961, the district court in Sakezzie v. Utah Indian Affairs Comm'n, 198 F. Supp. 218 (D. Utah 1961) noted many of these same concerns. The court found that "the fund was not intended for the benefit of the Navajo Tribe as a whole and the interest of the Tribe as a whole in some respects has been in conflict with those of the Indians residing upon the Aneth Extension." Id. at 221. Two years later the court reiterated these findings in Sakezzie v. Utah State Indian Affairs Commission, 215 F. Supp. 12 (D. Utah 1963). Although Congress knew of these decisions and the previous history, it made no effort to hinder the beneficiaries' right of action when it passed the 1968 Amendment. See Pub. L. No. 90-306 (lacking any affirmative withdrawal of beneficiaries' right of action). True, Congress did expand the class of beneficiaries; however, this expansion provided benefits to more people, it didn't curtail the rights of the current beneficiaries

14

under the Act. See United States v. Jim, 409 U.S. 80 (1972) (per curiam) (holding that the 1933 Act beneficiaries were not deprived of property in a Fifth Amendment sense by expansion of beneficiary class).

A major part of the 1933 Act was the setting aside of a fund for the benefit of the residents of the extension. In light of the Act's history, it can hardly be argued that the Aneth Navajos were not one of the primary beneficiaries of the Act. See Babbitt, 53 F.3d at 1149. Congress was quite aware of the plight of these clans and their separation from the Tribe as a whole, Hearings on S. 3782, supra, at 13, and, through the acts, addressed those concerns. Therefore, we hold that the fund beneficiaries were "one of the class for whose especial benefit the [1933 Act] was enacted." Cort, 422 U.S. at 78.

2.

The second inquiry under Cort is whether there is any evidence of legislative intent, either explicit or implicit, to create the right. Cort, 422 U.S. at 78. As legislative intent can be divined from an examination of legislative design, see Crandon v. United States, 494 U.S. 152, 158 (1990), as well as from the legislative history, we will analyze the Act under the third prong of Cort--whether the right is consistent with the legislative scheme and purpose--in tandem with the second prong.

There is very little contemporaneous legislative history of the 1933 Act indicating whether Congress intended to create a right of action. However, the nature of the Act's intended operation along with subsequent court cases (of which Congress was fully

15

cognizant when it passed the 1968 Amendments, see, e.g., Hearings on S. 2535 Before the Sub-Comm. on Indian Affairs of Comm. on Interior and Insular Affairs, 89th Cong., 2d Sess. 16 (1966); Hearings on S. 391 Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs, 90th Cong., 1st Sess. 97 (1967)) seem to indicate that the fund was to operate with trust-like rights and responsibilities--including the beneficiaries' rights to bring suit to address breaches of fiduciary duty.

The 1933 Act affects four parties: the United States, the Navajo Tribe, the Navajo residents of the Aneth Extension, and the State of Utah. The law adds the Aneth Extension to the Navajo Reservation and gas royalties from production on the land. The Tribe therefore received the benefit of added territory and 62½ % of the oil and gas royalties resulting from production of oil and gas on the land. However, the 1933 Act grants the Tribe no control or interest in the 37½% of the royalties that are to be expended by Utah for the benefit of the Navajo Indians residing in the San Juan County.[9]

The second effect of the law, the creation of the relationship between the State and the residents of the Aneth Extension, is where the crucial question in this matter lies. In

---

[9] This finding is not inconsistent with Jim and its holding that the fund beneficiaries do not have a constitutional property interest in the fund. The Jim Court noted that "[w]hatever title the Indians have is in the tribe." Jim, 409 U.S. at 82 (emphasis added). Jim did not say that the Tribe had any interest in the 37½% fund. Moreover, no title is necessary for the San Juan Navajos to have an equitable cause of action as beneficiaries of the fund. Cf. Restatement (Second) of Trusts § 128 (1959) (noting that beneficiaries' interest extends only so far as is within the settlor's intention). Of course, the Tribe's rights to the land of the Aneth Extension and the 62½% remainder are not at issue in this case.

this part of the law, it appears Congress created a common-law trust-like structure. The Restatement of Trusts explains that, "A trust . . . is a fiduciary relationship with respect to property, subjecting the person by whom title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." Restatement (Second) of Trusts § 2 (1959). The 1933 Act diverts the 37½ % of the oil and gas royalties from the Aneth Extension to the State of Utah, "Provided, That said 37½ per cent of the royalties shall be expended by the State of Utah in the tuition of Indian children in white schools and/or in the building and maintenance of roads across [the Aneth Extension], or for the benefit of the Indians residing therein." 47 Stat. 1418. Although far from being clearly drafted, we can ascertain that there was property to be transferred from the United States government to Utah (the 37½ % of royalties), there was a definite set of priorities set forth by which Utah's discretion was limited (tuition of Indian children, road construction, the benefit of the Indians), and, finally, there was a set of beneficiaries (the Navajo residents of the Aneth Extension). This framework closely tracks the definition of a trust. Cf. Cheyenne-Arapaho Tribes of Oklahoma v. United States, 966 F.2d 583, 588-89 (10th Cir. 1992) (noting that the elements of a common-law trust are a trustee, beneficiary, and corpus), cert. denied, 507 U.S. 1004 (1993). If in fact the 1933 Act creates a trust-like relationship, it is logical that the beneficiaries would have a cause of action against the State in the event of a breach of that trust. Cf. United States v. Mitchell, 463 U.S. 206

17

(1983) (finding where pervasive control is vested in the government over Native-American assets for their benefit, a right may lie in the beneficiaries to bring suit to address waste notwithstanding the lack of the term "trust" in the authorizing document).

The State claims that the "clear statement rule," a concept with its roots in Eleventh Amendment jurisprudence which dictates that encroachments upon a state's sovereignty can only be made by a clear statement of congressional intent to do so, precludes a finding of a cause of action in favor of Plaintiffs. In support of this claim, the State cites several cases which apply the clear statement rule in the context of determining whether a federal statute has abrogated a state's Eleventh Amendment immunity. See Blatchford v. Native Village of Noatak, 501 U.S. 775 (1991) (holding suit for damages by tribe against state barred by the Eleventh Amendment); Dellmuth v. Muth, 491 U.S. 223 (1989) (holding only clear statement of abrogation of states' Eleventh Amendment immunity is effectual); Atascadero State Hosp. v. Scanlon, 473 U.S. 234 (1985) (noting abrogation of states' Eleventh Amendment immunity requires a clear statement). Utah also cites authority which discusses the clear statement rule in the context of the Tenth Amendment. See Laurence Tribe, American Constitutional Law §§ 5-8, 5-20 (2d ed. 1988). See also Gregory v. Ashcroft, 501 U.S. 452 (1991). The State has not shown that the clear statement rule has been applied in a context other than the Tenth and Eleventh amendments--neither of which is a live controversy in the present case. Any argument that the Act violates the Tenth Amendment will not be addressed on this appeal, see supra

18

note 7, and the State affirmatively waived its Eleventh Amendment immunity. Accordingly, any argument premised upon the clear statement rule must fail.

Perhaps the most compelling basis for Plaintiffs' suit is legislative acquiescence. After the Aneth Extension had begun to generate royalties in the late 1950's, a group of the beneficiaries of this fund filed suit to enjoin certain expenditures from the fund. See Sakezzie v. Utah Indian Affairs Comm'n, 198 F. Supp. 218, 221 (D. Utah 1961), supp. op. 215 F. Supp. 12 (D. Utah 1963). In Sakezzie, the district court ruled that, "In administering the fund [Utah] occup[ies] a position of trust and confidence toward the Indian beneficiaries, and their conduct should be determined and judged by exacting fiduciary standards within the trust and discretion which Congress saw fit to repose in the agencies of the State in carrying out the purposes of the Federal Act." Sakezzie, 198 F. Supp. at 224. Furthermore, the court noted Utah's failure to provide proper accounting of funds. Id. at 221-22. Accordingly, the court restricted the purposes for which Utah could expend the fund and required an accounting to the beneficiaries. Id. at 225-26. It was in response to these rulings that Congress passed the 1968 Amendment.

The State claims that by passing the 1968 Amendments, Congress expressed its displeasure with the holdings in Sakezzie and overruled the case entirely. The State is correct that the Congressional intent was to expand the reach of the 1933 Act as compared with the Sakezzie court's interpretation. The 1968 Amendment clearly expanded the group of beneficiaries and the purposes for which the fund could be

19

expended in response to the district court's interpretations, which were viewed as overly restrictive. See S. Rep. No. 391, 90th Cong., 1st Sess. 2 (1967). See also Hearings on S. 391 Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs, 90th Cong., 1st Sess. 19, 21(1967). However, the 1968 Amendment also partially codified Sakezzie by requiring Utah's yearly submission of a report for the information of the beneficiaries. Compare Pub. L. No. 90-306 (1968) with Sakezzie, 198 F. Supp. at 18, 24. Obviously, Congress considered Sakezzie and its ramifications when it passed the 1968 Amendment. See, e.g., Hearings on S. 391, supra, at 4, 17-18, 21-22. Yet, in no way did Congress attempt to restrict the beneficiaries' access to the courts to redress breaches of trust. See Pub. L. No. 90-306, 82 Stat. 121 (1968). We can only conclude that Congress was cognizant of the previous cases and implicitly approved of the cause of action by failing to restrict it in the 1968 Act. Cf. Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 73, 78 (1992) (noting implicit approval of remedy when, with cognizance of prior case law, Congress fails to limit its availability when amending an act).

In summary, the statutory scheme, the legislative history, and the subsequent legislative acquiescence, all support the finding of a trust relationship. Accordingly, we hold that the second and third prongs of the Cort test favor Plaintiffs' cause of action.

3.

20

The fourth prong of the <u>Cort</u> test asks whether the right is one that is traditionally a state concern and therefore inappropriate for a federal cause of action. <u>Cort</u>, 422 U.S. at 78. The State argues that trust law is ordinarily the concern of states and thus is an inappropriate area for a federal cause of action. However, in making this argument, the State misapprehends the true nature of the matters at issue. The overriding legal area implicated in this case is the care of Native Americans--a uniquely federal question. <u>See, e.g.</u>, <u>Mitchell</u>, 463 U.S. 206; <u>Babbitt</u>, 53 F.3d 1145. The State's argument on this issue must fail. We find that this case involves an area of law not within the purview of the states, but rather one that is solidly within the federal realm.

We hold that Congress intended to create a discretionary trust for the benefit of the San Juan Navajos with the State of Utah as trustee and the 37½ % royalties as the <u>res</u>. Accordingly, the beneficiaries do, insofar as they assert a breach of fiduciary duty, state a claim upon which relief can be granted. Thus, the district court improperly dismissed Plaintiffs' complaint.

Having found the existence of a fiduciary relationship between the State and Plaintiffs, we note several factors for the district court's consideration on remand. This discretionary trust provides the state with great latitude in its decision-making processes.[10]

---

[10]    Scott and Fratcher note that, "The beneficiary [of a discretionary trust] cannot obtain the assistance of the court to control the exercise of the trustee's discretion except to prevent an abuse by the trustee of his discretionary power[,] . . . the court will not interfere unless he acts dishonestly or from an improper motive or fails to use his judgment." 2 Austin W. Scott & William F. Fratcher, <u>The Law of Trusts</u> § 128.3 (4th ed.

21

The statute provides that the funds shall be expended for the "the health, education, and general welfare of the Navajo Indians residing in San Juan County." Pub. L. No. 90-306, 82 Stat. 121.

## B. The Tribe

We now turn to the dismissal of the Tribe's complaint. The Tribe proffers two bases for a cause of action in its favor. The first argument is that the original title to the lands from whence the oil and gas royalties flow is in the Tribe and thus the Tribe has a right to bring suit against the State for the mismanagement of these funds. The second argument is that pursuant to 28 U.S.C. § 1362, the Tribe may "stand in the shoes" of the United States government and litigate any claim that the United States could. We hold that both of the Tribe's asserted bases for a cause of action must fail and thus affirm the district court's dismissal of the Tribe's complaint.

Contrary to the Tribe's claim, we do not believe that the Navajo Nation has any ownership interest in the 37½% of the royalties generated by the Aneth Extension. We note that prior to the addition of these lands to the Navajo Reservation, these lands were public lands. See Babbitt, 53 F.3d at 1147; 47 Stat. 1418. Contemporaneous with adding these lands to the reservation, Congress chose to reserve a portion of any oil and gas revenues. Congress then transferred the ownership interest in these proceeds to the State

---

1987). Cf. Restatement (Second) of Trusts § 199 (1959) (outlining equitable remedies available to the beneficiaries of a trust).

22

of Utah to hold as trustee for the benefit of the Aneth Extension Navajos. Therefore, since the Tribe never possessed an ownership interest in these proceeds, see Pub. L. No. 90-306, 82 Stat. 121, the Tribe could not have a federal common-law claim based on its ownership interest.[11]

Citing Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463 (1976), the Tribe also claims that 28 U.S.C. § 1362 grants the Tribe the right to assert any claim or prosecute any cause which the United States could bring as the trustee of the tribes. While it is true that Moe could be read as granting to the Indian tribes the right to raise a claim that the United States could raise on the tribe's behalf, this argument misapprehends whose cause of action is at issue in this case. The United States could likely bring a suit to vindicate the rights of the Navajos in San Juan County, but there would be no action which the United States could bring on the behalf of the Navajo Tribe, at least not with respect to the trust fund. The Tribe's right under this statute is purely limited to one of involvement in planning, no more. See Pub. L. No. 90-306, 82 Stat. 121. To whatever extent 28 U.S.C. § 1362 authorizes the Tribe to step into the shoes of the United States, the right being enforced must be one that the United States could vindicate on the behalf of the Tribe. Cf. Blatchford, 501 U.S. at 784. The fact that the trust's

---

[11] The Tribe also argues that it must have an ownership interest because were it not for its leases, the funds would not exist. While it may be true that the Tribe could choose to not allow oil and gas production on its lands and thus cut off the trust fund's source of revenue, the fact remains that the United States reserved a 37½% portion "[s]hould oil or gas be produced in paying quantities." 47 Stat. 1418 (1933).

23

beneficiaries are Navajos is not sufficient to vest a right in the Tribe.  Accordingly, the Tribe cannot step into the shoes of the United States to attempt to prosecute a suit in favor of the San Juan County beneficiaries.  The district court's dismissal of the Tribe's complaint was proper.[12]

The district court's dismissal of Plaintiffs' complaint is reversed and remanded for proceedings consistent with this opinion.  The district court's dismissal of the Tribe's complaint is affirmed.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

---

[12]      While the Tribe's complaint is properly dismissed, we do not hold that the Tribe may never have a cause of action under the Act.  The Act clearly dictates that "Planning for such expenditures [from the fund] shall be done in cooperation with . . . the Navajo Tribe, insofar as is practicable to accomplish the objects and purposes of this Act." Pub. L. No. 90-306,  82 Stat. 121 (1968) (emphasis added).  Insomuch as it is necessary to vindicate the Tribe's right to participation in planning, we note the possible existence of a cause of action, but we do not reach that issue.