286 F.3d 1195
 TIMPANOGOS TRIBE, Snake Band of Shoshone Indians of Utah Territory, Plaintiff-Appellee,
v.
Kevin CONWAY, Assistant Director, Utah Department of Natural Resources, Division of Wildlife Resources; Michael O. Leavitt, Governor of the State of Utah, Defendants-Appellants.
Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, Amicus Curiae.
 No. 01-4056.
 United States Court of Appeals, Tenth Circuit.
 April 15, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Philip C. Pugsley, Assistant Attorney General (Mark L. Shurtleff, Attorney General, with him on the briefs), State of Utah, Salt Lake City, UT, for Defendants-Appellants.
 Michael L. Humiston of Heber City, UT, for Plaintiff-Appellee.
 Sandra Hansen, Office of Legal Counsel, Ute Indian Tribe, Fort Duchesne, Utah; and Tod J. Smith of Whiteing & Smith, Boulder, CO, filed a brief for Amicus Curiae.
 Before SEYMOUR and HENRY, Circuit Judges, and OBERDORFER,* District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 The Timpanogos Tribe, Snake Band of Shoshone Indians of Utah Territory and aboriginal inhabitants of the region, filed suit against Kevin Conway, Assistant Director of the Utah Department of Natural Resources, and Governor Michael Leavitt of Utah. The district court denied defendants' motion to dismiss on the basis of, inter alia, Eleventh Amendment immunity. Defendants filed an interlocutory appeal of the Eleventh Amendment immunity issue and ask us to assert pendant appellate jurisdiction over the other issues argued in support of their motion to dismiss. We reach only the issues of Eleventh Amendment immunity and subject matter jurisdiction, and we affirm.
 
 I.
 
 2
 The Tribe's complaint originally sought to quiet title on the Uintah Valley Reservation and obtain the following: a declaration that the Timpanogos Tribe, and not the Ute Tribe, are the "Indians of Utah" contemplated in the Executive Order, see Exec. Order, 1 Kappler 900 (Oct. 3, 1861), and Congressional Act, see Act of May 5, 1864, ch. 77, 13 Stat. 63, creating the Reservation; recognition of their rights under the Order and Act, specifically rights to hunt, fish, and gather; and a declaration that Messrs. Conway and Leavitt have no authority to regulate or control the hunting, fishing, or gathering rights of the Timpanogos Tribe on Indian lands within the Reservation, except as such authority is explicitly granted to the State of Utah by Act of Congress or consented to by the Tribe. Defendants filed a motion to dismiss under FED.R.CIV.P. 12(b)(6) raising five issues: (1) Eleventh Amendment immunity; (2) res judicata; (3) lack of subject matter jurisdiction under 28 U.S.C. § 1331; (4) failure to join indispensable parties; and (5) laches.
 
 
 3
 Over the course of a hearing on the motion and at the suggestion of the district court, the Tribe narrowed its complaint to come within the Ex parte Young exception to Eleventh Amendment sovereign immunity. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). By the end of the hearing, the Tribe had agreed to amend its complaint to seek nothing more than prospective, non-monetary, injunctive relief as to its hunting, fishing, and gathering rights within the Indian-controlled lands of the Uintah Valley Reservation.[1] The district court denied the motion to dismiss on all grounds.
 
 II.
 
 4
 Our initial concern on appeal is jurisdictional. Courts of appeals normally have jurisdiction only over final decisions of the district courts. 28 U.S.C. § 1291. There are exceptions to the final judgment rule. A judgment that is not the complete and final judgment in a case is immediately appealable if it "fall[s] in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 143, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)).
 
 
 5
 It is well-established that orders denying individual officials' claims of absolute and qualified immunity are among those that may be immediately appealed. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (qualified immunity); Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (absolute immunity). In Puerto Rico Aqueduct, the Court extended the Cohen collateral-order doctrine to denials of states' and state entities' claims to Eleventh Amendment immunity. See Puerto Rico Aqueduct, 506 U.S. at 147, 113 S.Ct. 684 ("We hold that States and state entities that claim to be `arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity."). We thus properly exercise appellate jurisdiction over the Eleventh Amendment claim.
 
 
 6
 Defendants also urge us to exercise pendant appellate jurisdiction over the other claims asserted in their motion to dismiss, although none of them would warrant an interlocutory appeal on its own. Those issues include res judicata, subject matter jurisdiction under 28 U.S.C. § 1331, failure to join necessary and indispensable parties under FED.R.CIV.P. 19(b), and laches. In addition, defendants contend the complaint should be dismissed for the alleged failure of the Tribe to exhaust administrative remedies for federal tribal recognition under 25 C.F.R. Part 83.
 
 
 7
 We have jurisdiction over an extremely narrow class of claims raised interlocutorily. The collateral order doctrine sets a high bar for any interlocutory appeal, allowing appeal from only those decisions that are conclusive, resolve important questions separate from the merits, and are effectively unreviewable on appeal from final judgment. See Cohen, 337 U.S. at 546, 69 S.Ct. 1221. In Swint v. Chambers County Comm'n, 514 U.S. 35, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), the Supreme Court held the Cohen doctrine applies to pendent claims as well. Pendant claims are thus appealable "if, and only if, they too fall within Cohen's collateral-order exception to the final-judgment rule." Id. at 49, 115 S.Ct. 1203.
 
 
 8
 In urging us to take jurisdiction over their pendent claims, defendants cite to only one case: the Fifth Circuit's pre-Swint decision in In re Nissan Motor Corp. Antitrust Litigation, 552 F.2d 1088 (5th Cir.1977). Nissan held interlocutory review may include related, threshold issues raised in the same motion which have the potential of being dispositive. Id. at 1096. Our circuit, however, has taken a different approach to the issue in light of Swint.
 
 
 9
 We have recognized that the exercise of pendent appellate jurisdiction "is generally disfavored." Armijo By and Through Chavez v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1264 (10th Cir.1998) (quoting Moore v. City of Wynnewood, 57 F.3d 924, 929 (10th Cir.1995)). With that in mind, we have interpreted Swint to mean that pendent appellate jurisdiction may still be appropriate "where the otherwise nonappealable decision is `inextricably intertwined' with the appealable decision, or where review of the nonappealable decision is `necessary to ensure meaningful review' of the appealable one." Moore, 57 F.3d at 930 (quoting Swint, 514 U.S. at 51, 115 S.Ct. 1203); see also Armijo, 159 F.3d at 1264-65.
 
 
 10
 [A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal — that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well.
 
 
 11
 
 Id.
 
 
 
 12
 Defendants do not provide any reasons why their pendent claims based on res judicata, Rule 19(b), exhaustion, and laches are "inextricably intertwined" with their Eleventh Amendment interlocutory claim. In fact, they do no more than cite to Nissan. Having reviewed these claims in light of the precedents in this circuit, we are unable to find any justification that would allow us to exercise appellate jurisdiction over them.
 
 
 13
 We reach a different result with respect to defendants' claim that the Tribe has failed to identify a basis for the exercise of subject matter jurisdiction under 28 U.S.C. § 1331. The Supreme Court recently reiterated its longstanding rule that jurisdiction is a threshold question which an appellate court must resolve before addressing the merits of the matter before it. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). "`On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes.'" Id. at 94, 118 S.Ct. 1003 (quoting Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453, 20 S.Ct. 690, 44 L.Ed. 842 (1900)). "[I]f the record discloses that the lower court was without jurisdiction this court will notice the defect.... [W]e have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." Id. at 95, 118 S.Ct. 1003 (internal quotations omitted).
 
 
 14
 In concluding we must address defendants' argument that the district court lacked subject matter jurisdiction over the Tribe's claim, we agree with the Second Circuit's determination in Merritt v. Shuttle, Inc., 187 F.3d 263 (2d Cir.1999), that deciding the jurisdictional issue in an interlocutory appeal does not run afoul of Swint. As in Merritt, our examination of the basis for the district court's subject matter jurisdiction over the Tribe's claim is necessary to ensure meaningful review of the district court's order denying Eleventh Amendment immunity on that claim. See id. at 269; see also ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1186 (10th Cir. 1998) (reviewing district court consideration of subject matter jurisdiction on interlocutory appeal necessary to provide "plenary review to issues under the Eleventh Amendment").
 
 
 15
 The existence of subject matter jurisdiction goes to the very power of the district court to issue the rulings now under consideration. Indeed, as the Supreme Court recently reminded, "[f]or a court to pronounce upon [the merits] when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires."
 
 
 16
 Merritt, 187 F.3d at 269 (quoting Steel Co., 523 U.S. at 101-02, 118 S.Ct. 1003) (internal citation omitted).
 
 
 17
 In sum, because we have appellate jurisdiction over the interlocutory appeal of defendants' assertion of Eleventh Amendment immunity, we also have appellate jurisdiction to determine whether the district court had subject matter jurisdiction over the Tribe's underlying claim against defendants in the first instance.[2] As we ordinarily do, we turn first to the merits of the subject matter jurisdiction issue, and then to the merits of the Eleventh Amendment issue.
 
 III.
 
 18
 Defendants assert the district court lacks subject matter jurisdiction because plaintiffs have failed to state a claim that raises a cognizable federal question. The crux of defendants' contention, described in more detail below, is that the Tribe has no federal right on which to base a claim because it is not a "federally recognized" tribe.
 
 
 19
 In assessing whether the Tribe has stated a federal question in asserting its right to hunt on the Reservation, we look to the roots of the relationship between Indian tribes and the United States government. By the time of the Revolutionary War, "[i]t was accepted that Indian nations held `aboriginal title' to lands they had inhabited from time immemorial." County of Oneida v. Oneida Indian Nation of N.Y., 470 U.S. 226, 233-34, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (Oneida II).
 
 
 20
 It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign-first the discovering European nation and later the original States and the United States-a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States.
 
 
 21
 Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (Oneida I).
 
 
 22
 The federal government has formally recognized the rights of Indians to specified areas of land through treaties with tribes and by statute and executive order. See generally FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, at 473-81 (1982 ed.).
 
 
 23
 Beyond general principles of liberal interpretation of treaties in favor of tribes, there are certain rules with respect to the interpretation of treaty provisions establishing tribal land ownership. So long as a treaty purports to recognize Indian title or permanent rights to particularly described land it creates a recognized Indian title. Accordingly, phrases in treaty grants such as "use and occupancy" or "as Indian lands are held" do not refer to original Indian title but are held to vest recognized and enforceable property rights in the tribes."
 
 
 24
 Id. at 476.
 
 
 25
 The reservation at issue here was created by executive order and approved by an act of Congress.[3] The Act authorized and required the collection and settlement of the Indians of the Utah territory in the Uintah Valley, which was "set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." Id. Under the accepted construction principles applicable to the creation of Indian reservations quoted above, the language of the Act setting apart the Uintah Valley for the permanent settlement and exclusive occupancy of Utah Indian tribes recognized and guaranteed the Indian rights of the tribes who settled there. Those rights include the hunting rights at issue in this case. "As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress. These rights need not be expressly mentioned in the treaty." United States v. Dion, 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986) (internal citation omitted).
 
 
 26
 "It is rudimentary that `Indian title is a matter of federal law and can be extinguished only with federal consent' and that the termination of the protection that federal law, treaties, and statutes extend to Indian occupancy is `exclusively the province of federal law.'" Wilson v. Omaha Indian Tribe, 442 U.S. 653, 670-71, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (quoting Oneida I, 414 U.S. at 670, 94 S.Ct. 772). Although the Tribe here asserts Indian title under a federal statute, defendants nevertheless argue that the Tribe's claim does not arise under federal law for purposes of subject matter jurisdiction pursuant to section 1331. Defendants contend the Tribe is barred from proceeding under section 1331 because the Tribe is not administratively recognized by the Bureau of Indian Affairs of the Department of Interior pursuant to 25 C.F.R. Pt. 83, because the Tribe was not included as one for whose benefit the Reservation was created, and because the Act creating the Reservation was not intended to create an implied cause of action. The main thrust of all defendants' arguments is an assertion that the Tribe's lack of federally recognized status is fatal to its ability to proceed under section 1331. We disagree.
 
 
 27
 In 1978, the Department of the Interior promulgated regulations establishing the procedures by which it would acknowledge "that certain American Indian groups exist as tribes." 25 C.F.R. § 83.2.[4] Administrative recognition of an Indian tribe is now a prerequisite to that tribe's ability to obtain "the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes." Id. However, the federal government had previously recognized groups of Indians as tribes in a variety of ways for a variety of purposes. See generally COHEN, at 3-7. Even after the promulgation of Part 83, "tribes cannot be neatly divided into `recognized' and `nonrecognized' tribes for all purposes; rather, a tribe may `exist' for some purposes but not for others." Id. at 7.
 
 
 28
 Moreover, "[t]he Department of the Interior cannot under any circumstances abrogate an Indian treaty directly or indirectly. Only Congress can abrogate a treaty, and only by making absolutely clear its intention to do so." United States v. Washington, 641 F.2d 1368, 1371 (9th Cir.1981); see also Dion, 476 U.S. at 738-40, 106 S.Ct. 2216; Wilson, 442 U.S. at 670-71, 99 S.Ct. 2529. Thus, the fact that a tribe is not administratively recognized does not affect that tribe's vested treaty rights. See Greene v. Babbitt, 64 F.3d 1266, 1270 (9th Cir.1995); see also Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) (treaty hunting rights survived despite congressional termination of all formal tribal political authority). "[A] tribe's recognition or lack of recognition by the Secretary of the Interior does not determine whether the tribe has vested treaty rights." Greene, 64 F.3d at 1270. "Non-recognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights." Id. (quoting United States v. Washington, 520 F.2d 676, 692-93 (9th Cir.1975)). Accordingly, the Tribe here may establish federal question jurisdiction in asserting its hunting rights despite the fact that it is not recognized by the Department of the Interior.
 
 
 29
 Defendants rely on Western Shoshone Bus. Council v. Babbitt, 1 F.3d 1052 (10th Cir.1993), in arguing that the Tribe's lack of recognized status bars its ability to assert its Indian rights under the Act creating the Uintah reservation. Western Shoshone is distinguishable, however, due to the nature of the federal statute involved in that case. The Tribe in Western Shoshone was seeking to assert rights under 25 U.S.C. § 81, which requires that contracts with tribes for the payment of money be approved by the Bureau of Indian Affairs. Section 81 created a federal benefit available to Indian tribes officially recognized for that purpose. Because the tribe in that case was not administratively recognized, we held it was not within the zone of interests protected by section 81 and therefore had no standing to bring suit. Here, however, the statute establishing the reservation did not create a federal benefit or provide a federal service; rather, it recognized and guaranteed preexisting rights. Western Shoshone addressed only the ability of an unrecognized tribe to obtain statutory benefits created by the federal government; it does not apply to preexisting Indian rights recognized and guaranteed by a treaty, statute, or executive order.
 
 
 30
 Defendants' remaining challenges to subject matter jurisdiction under section 1331 may be addressed summarily. Defendants contend the Tribe cannot claim rights under the Act establishing the Reservation because it is not a tribe for whose benefit the Reservation was created. It does not appear from the scant record before us on appeal that defendants presented this argument to the district court. In any event, as the district court observed, on a motion to dismiss under Rule 12(b)(6) the court "must accept as true all the factual allegations in the reasonable inferences in plaintiff's favor." Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996). The allegations in the Tribe's complaint, taken as true, are clearly sufficient for purposes of a motion to dismiss to demonstrate that the Tribe is a group to whom the Act applies.
 
 
 31
 Defendants also assert that the Tribe may not maintain an action to enforce its rights under the Act which established the Reservation because the Act was not intended to create a private cause of action under the analysis of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). However, the legion of cases in which tribes have sued to enforce Indian rights protected by treaties, statutes and executive orders have proceeded without undertaking that analysis. See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (tribe sued state entities and officials seeking injunctive relief with respect to treaty hunting and fishing rights guaranteed by treaty). As the Supreme Court explained in Oneida II, "Indians have a federal common-law right to sue to enforce their aboriginal land rights." 470 U.S. at 235, 105 S.Ct. 1245. The Court also held that the Nonintercourse Act of 1793, the Act claimed by petitioners in Oneida II to preempt the Indians common-law rights, did not do so because it "did not establish a comprehensive remedial plan for dealing with violations of Indian property rights. There is no indication in the legislative history that Congress intended to pre-empt common-law remedies." Id. at 237, 105 S.Ct. 1245; see also Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 473, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) ("[I]t would appear that Congress contemplated that a tribe's access to federal court to litigate a matter arising `under the Constitution, laws, or treaties' would be at least in some respects as broad as that of the United States suing as the tribe's trustee").
 
 
 32
 The only case cited by defendants in support of their argument, Pelt v. State of Utah, 104 F.3d 1534 (10th Cir.1996), is clearly distinguishable. The relevant portion of the statute at issue in Pelt provided that a portion of oil and gas royalties from tribal leases on lands added to the Navajo Indian Reservation were to be paid to the State of Utah and were to be expended by the State for the health, education, and welfare of Navajo Indians. The Navajo Indian beneficiaries of the royalty fund sued the State of Utah under the statute for breach of fiduciary duty. The case presented the question whether the plaintiffs had a cause of action for breach of duty under the Act creating the royalty fund and under federal common law trust principles. Because Pelt did not involve a suit to enforce Indian rights recognized by treaty or statute, it is inapposite here. We have found no case in which a tribe asserting Indian rights under the treaty or statute guaranteeing them was required to satisfy the requirements of Cort v. Ash, and we decline to impose such a requirement here.
 
 
 33
 We conclude that the district court had subject matter jurisdiction over this action under section 1331 and we proceed to the merits of the court's ruling on Eleventh Amendment immunity.
 
 IV.
 
 34
 It is defendants' position that, as state officials, they are protected by Eleventh Amendment immunity from suit by the Tribe. The Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state or citizens of another state. See Hans v. Louisiana, 134 U.S. 1, 13-15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). When a party files suit against a state official in federal court seeking only prospective, equitable relief for violations of federal law, however, that case may proceed. See Ex parte Young, 209 U.S. at 159-160, 28 S.Ct. 441; see also Elephant Butte Irrigation Dist. v. Dep't of the Interior, 160 F.3d 602, 607-608 (10th Cir.1998). While the decision whether to apply the Ex parte Young doctrine "is often less than clear," Elephant Butte, 160 F.3d at 608, this is not one of those cases.
 
 
 35
 The Tribe's original complaint sought broad relief on a number of questions that would have implicated Eleventh Amendment concerns. In the hearing on the motion to dismiss, the district court encouraged the Tribe to narrow its claims accordingly. The Tribe represented to the district court it would do so. Once amended, the complaint will seek no more than an injunction barring Utah state officials from prosecuting members of the Timpanogos Tribe for hunting, fishing, and gathering with Tribe-issued licenses on Indian lands within the Uintah Reservation. The Tribe acknowledges that it is obligated to file amended pleadings conforming to the trial court's ruling. Aplee. Br. at 4. At oral argument, counsel for defendants responsibly conceded that if, as we believe is the case, the issue now before us involves no more than the Timpanogos Tribe's right to hunt and fish on Indian land within the Uintah Valley Reservation, this case falls squarely within the exception set out by Ex parte Young and its progeny.
 
 
 36
 In applying the Ex parte Young doctrine, we follow a four-part framework. See Elephant Butte, 160 F.3d at 609. First, we determine whether the action is against state officials or the state itself. Second, we look at whether the alleged conduct of the state officials constitutes a violation of federal law. Third, we assess whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages impacting the state treasury. Finally, we analyze whether the suit rises to the level of implicating "special sovereignty interests." Id. (quoting ANR Pipeline Co., 150 F.3d at 1193). The action here meets this test. It is against state officials for conduct that allegedly violates the rights of the Tribe under the Congressional Act of 1864. It seeks only prospective relief that would not in any way retroactively affect the state treasury. Finally, considering that the state has no sovereign interests over Indian land, or more particularly, no interest in enforcing its gaming laws within sovereign Indian territory, the injunction sought implicates no special sovereignty interests. Compare Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281-88, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (holding action equivalent to quiet title over navigable waters regulated and controlled by state is form of prohibited relief); see also Elephant Butte, 160 F.3d at 611-13. The district court correctly held the Eleventh Amendment inapplicable.
 
 
 37
 For the forgoing reasons, we AFFIRM the decision of the district court denying defendants' motion to dismiss the Tribe's claim against them for lack of subject matter jurisdiction or on the basis of Eleventh Amendment immunity.
 
 
 
 Notes:
 
 
 *
 Louis F. Oberdorfer, United States District Judge for the District of the District of Columbia, sitting by designation
 
 
 [1]
 The district court made clear in the hearing on the motion to dismiss that the Tribe's claims as to rights within the boundaries of the Uintah Valley Reservation do not relate to lands within the reservation that have been explicitly withdrawn
 
 
 [2]
 This is so notwithstanding the fact that the denial of a motion to dismiss for lack of subject matter jurisdiction is not ordinarily entitled to interlocutory reviewSee Catlin v. United States, 324 U.S. 229, 236, 65 S.Ct. 631, 89 L.Ed. 911 (1945). We emphasize that our jurisdiction to review subject matter jurisdiction in this case exists only because we have interlocutory appellate jurisdiction over defendants' assertion of Eleventh Amendment immunity from the Tribe's claim, the very claim which defendants contend the district court lacks subject matter jurisdiction to consider.
 
 
 [3]
 Indian reservations created by statute, agreement, or executive order generally have the same legal ramifications as those created by treatySee United States v. Dion, 476 U.S. 734, 745 n. 8, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986); FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, at 127-28 (1982 ed.).
 
 
 [4]
 These regulations cite as statutory authority for their promulgation 5 U.S.C. § 301; 25 U.S.C. §§ 2, 9; and 43 U.S.C. § 1457See 25 C.F.R. Pt. 83. "The term tribe has no universal legal definition. There is no single federal statute defining an Indian tribe for all purposes, although the Constitution and many federal statutes make use of the term." COHEN, at 3.